527 A.2d 997

**In the Matter of Honorable Joseph R. GLANCEY Philadelphia Municipal Court and Honorable John J. Chiovero Court of Common Pleas of Philadelphia County.**

Supreme Court of Pennsylvania.

Argued April 8, 1987.

Decided June 17, 1987.

John Rogers Carroll, Joseph J. Carlin, Philadelphia, for respondent.

Robert Keuch, Executive Director, J.I.R.B., Harrisburg, for petitioner.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

This matter compels us to address the question of whether the constitutional privilege against self-incrimination may be validly asserted by a judge in this Commonwealth, to avoid making financial disclosures mandated by a pre-existing order of this Court and designed to preserve the integrity and impartiality of our judicial system. That question and others of constitutional dimension are here presented in a challenge to the validity of our removing from office two judges, for invoking the privilege instead of making the required financial disclosures.

Pennsylvania Supreme Court Order No. 47, promulgated April 13, 1984, requires all judicial officers of this state's Unified Judicial System to make certain financial disclosures by filing with the Administrative Office of the Pennsylvania Courts ("AOPC"), on an annual basis, a report called a Statement of Financial Interest ("Statement").[1] Question 11 on the Statement requires the judicial officer to list all gifts received in cash or property having a value of

1. 503 Pa. XXXIV, 472 A.2d LIV.

$200.00 or more.[2] If no such gifts were received the word "none" should be entered in response to the question. Order No. 47 also provides that the knowing and willful failure to report information required by the Statement shall constitute a charge of *misconduct* and result in referral of the case to the Judicial Inquiry and Review Board ("Board").

Pursuant to Article 5, section 18 of the Pennsylvania Constitution a judicial officer "may be suspended, removed from office or otherwise disciplined for ... misconduct in office, neglect of duty, failure to perform his duties, or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute...." This same constitutional provision mandated the creation of the Board, invested it with the power to investigate complaints of judicial misconduct or neglect of duty, to hold hearings, and, upon a finding of good cause, to recommend to the Supreme Court that one of the constitutionally-designated sanctions be imposed. This Court, after reviewing the record of the Board's proceedings, may order suspension, removal or other discipline of the judge involved, or wholly reject the recommendation, as it finds just and proper. Pa. Const. art. 5, § 18(h).

On May 1, 1986, the Honorable Joseph R. Glancey, President Judge of the Philadelphia Municipal Court, filed a Statement of Financial Interest for the year 1985. As an answer to Question 11 on the Statement, concerning gifts, Judge Glancey inserted the following: "Response respectfully declined at this time on grounds of constitutional privilege." Another judicial officer, the Honorable John J. Chiovero, also filed a Statement on May 1, 1986, for 1985. Judge Chiovero responded to Question 11 by stating: "On advice of counsel, this answer is not provided at this time in reliance upon the Fifth Amendment to the U.S. Constitution." Although the two judges varied in formulating their reasons for not providing the required information, it is clear that each was asserting that he did not have to answer

2. *Id.* at XXXVII, 472 A.2d at LVIII.

based on the constitutional privilege against self-incrimination.

The failure of Judges Glancey and Chiovero to answer Question 11 resulted in AOPC referring both matters to the Board. As a further consequence, the Board served upon each of the judges a Rule to Show Cause why sanctions should not be imposed. Specifically, the Rule directed each of the judges to show cause why "he should not be suspended from any and all judicial duties, with or without pay, pending a hearing to be held by the Board in accordance with its procedures as a result of Respondent's failure to fully comply with, answer and supply all information requested by the Supreme Court of Pennsylvania Statement of Financial Interest."

Judge Glancey and Judge Chiovero ("Respondents") each answered the Rule to Show Cause by first challenging the validity of the proceeding contemplated by the Board. The Respondents also asserted that to penalize them for their replies to Question 11 of the Statement amounted to a violation of the constitutional privilege against self-incrimination, guaranteed by the fifth amendment of the United States Constitution and made applicable to the states by the fourteenth amendment. The Board, with the concurrence of both judges, consolidated the cases because of the identity of the issues raised.

After holding an initial hearing the Board, on July 21, 1986, issued formal charges against both judges. First charged was that they had violated Article 5, section 17(b) of the Pennsylvania Constitution, which in part here pertinent, states: "Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court." The Respondents were also charged with violating Canons 1 and 2 of the Code of Judicial Conduct ("Code"), adopted by this Court on November 21, 1973, and made effective as of January 1, 1974. Canon 1 of the Code declares and mandates as follows:

**A Judge Should Uphold the Integrity and Independence of the Judiciary**

*An independent and honorable judiciary is indispensable to justice in our society.* A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct *so that the integrity and independence of the judiciary may be preserved.* The provisions of this Code should be construed and applied to further that objective. (Emphasis added.)

Canon 2 provides:

**A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities**

A. *A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.*

B. *A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment.* He should not lend the prestige of his office to advance the private interests of others; nor should he convey or knowingly permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness. (Emphasis added.)

The Commentary to Canon 2 makes a crucial observation: *"Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges.* A judge must avoid all impropriety and *appearance of impropriety.* He must expect to be the subject of constant public scrutiny. *He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly."* (Emphasis added.)

The Board also charged the Respondents with violating 42 Pa.C.S. § 3302, which, in addition to barring judges from engaging in certain enumerated activities, also provides that a judge shall not violate any canon of ethics prescribed

by general rule. This charge, like the others, was based on the Respondents' failure to answer Question 11 on the Statement of Financial Interest.

On October 27, 1986, the Board held a hearing on the formal charges. The facts of the case were stipulated to by the parties. The Respondents renewed their argument that the fifth amendment of the federal constitution barred the imposition of any penalty for not providing the information about the receipt of gifts. They also challenged the validity of Question 11 itself, by asserting that its inquiry does not relate to activity of a judge in his judicial capacity or in the conduct of his office. Following receipt of the report of the Hearing Panel, the Board prepared its Report and Recommendation, which it proceeded to file with this Court.

The Board found that the Respondents had knowingly and willfully failed to answer Question 11. The Board also concluded that such failure constituted misconduct, and amounted to violations of Article 5, section 17(b) of the Pennsylvania Constitution; Canons 1 and 2 of the Code of Judicial Conduct; and 42 Pa.C.S. § 3302. The Board reached the further conclusion that the Respondents' failure to answer the inquiry in issue "impugned the integrity of the judiciary and the judicial system, and reduced the public's confidence in the judiciary." The Board's recommendation to this Court was that the Respondents should be removed from their judicial offices.

A curious feature of the Board's Report is that, while finding that the Judges Glancey and Chiovero were guilty of misconduct and the other violations, the Board also concluded that the replies given by the two judges to Question 11 were a proper exercise of the fifth amendment privilege against self-incrimination. However, in the view of the Board, the propriety of those replies did not preclude the imposition of sanctions.

Before this Court, the Respondents reiterate their argument that the Board's recommendation of removal runs afoul of the fifth amendment privilege against compulsory self-incrimination. According to the Respondents they can-

not, consistent with the existence of the privilege, be penalized for having invoked it as a reply to Question 11. They also argue that the recommendation of removal violates the due process clause of the fourteenth amendment. Underlying this argument is a contention that no pre-existing statutory provision, canon of conduct or rule of this Court warned them that invoking the fifth amendment privilege would expose them to sanctions. Another due process infirmity envisioned by the Respondents is that to deprive them of their judicial offices, for not having answered Question 11, amounts to burdening their right to hold office with a condition or qualification not found in Article 5 of the Pennsylvania Constitution. In amplification of this argument, the Respondents further assert that the state constitution at no place requires the relinquishment of constitutional rights and privileges as a condition of holding public office; and that if it did, such a requirement would offend against the federal constitution.

The Respondents next complain that the Board's recommendation of removal is violative of constitutional due process because, in their view, the Board's participation in the instant matter improperly commingled the functions of prosecutor and adjudicator. In connection with this argument, it is also asserted that the Board's role in a previous proceeding against the Respondents prevented it from giving unbiased consideration to the phase of the case here involved.

Last, the Respondents contend that to remove them from office for having claimed the fifth amendment privilege is tantamount to making an inference that they are guilty of having received unlawful or improper gifts.

To resolve the issues here involved, it is helpful to begin by mentioning the Public Officials' Ethics Act, Act of October 4, 1978, P.L. 883, 65 P.S. § 401 *et seq.* ("Ethics Act"). Among the several provisions of this statute is a requirement that all officials of the Commonwealth and its subdivisions make certain disclosures concerning their personal financial affairs. To satisfy that requirement, every official

covered by the statute has to file on an annual basis, with the State Ethics Commission, a detailed statement setting forth such information as: interests in certain kinds of real estate, debts owed, business interests or associations, and sources of income. 65 P.S. § 405. The statement also has to include the name and address of any person from whom the public official has received *a gift or gifts with an aggregate value of $200.00 or more. Id.* As enacted, the Ethics Act applied to any elected or appointed official of the executive, legislative or *judicial branch of government,* as well as those of political subdivisions. 65 P.S. § 402.

The purpose of the Ethics Act was declared to be as follows:

> *The Legislature hereby declares that public office is a public trust and that any effort to realize personal financial gain through public office other than compensation provided by law is a violation of that trust. In order to strengthen the faith and confidence of the people of the State in their government, the Legislature further declares that the people have a right to be assured that the financial interests of holders of or candidates for public office present neither a conflict nor the appearance of a conflict with the public trust. Because public confidence in government can best be sustained by assuring the people of the impartiality and honesty of public officials, this act shall be liberally construed to promote complete disclosure.*

65 P.S. § 401 (emphasis added).

Notwithstanding the laudable purpose of the Ethics Act this Court, in *Kremer v. State Ethics Commission,* 503 Pa. 358, 469 A.2d 593 (1983), was constrained to hold the statute unconstitutional to the extent that it applied to judges, because of the doctrine of separation of powers. The basis for our holding in *Kremer* was not that the act did not address a compelling state interest or violated personal rights, but rather that the extension of the statute to judges unconstitutionally infringed upon the exclusive power of this Court to supervise the judicial branch of government

and its officers. 503 Pa. at 361, 469 A.2d at 595. We also pointed out that pursuant to our supervisory power over the judiciary, this Court had adopted the Code of Judicial Conduct, whose provisions effectively address the very interests the legislature sought to advance with the Ethics Act. *Id.*, 503 Pa. at 363, 469 A.2d at 595–96. Indeed, the statement of policy, purpose, and philosophy set forth in the Commentary to Canon 2 of the Code, *supra*, is essentially the same as the declaration of purpose underlying the Ethics Act. Thus, under both systems of regulation, requiring the disclosure of gifts of a certain value is designed to assure the people of the impartiality and honesty of office holders, and to promote public confidence.

We turn now to the Respondents argument based on the fifth amendment of the United States Constitution. In that regard, the Respondents contend that Question 11 on the Statement of Financial Interest compels an answer which creates a substantial exposure to criminal prosecution, and thus the reporting requirement is one they are constitutionally privileged not to answer. Their further assertion is, as indicated, that to deprive them of their judicial offices for invoking the privilege violates the fifth amendment and thus cannot be sustained. In support of the latter assertion, the Respondents rely on a line of cases consisting principally of *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Uniformed Sanitation Men Ass'n., Inc. v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); and *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). Each of these cases involved an attempt by governmental authority to treat an assertion of the fifth amendment privilege as a forbidden failure to cooperate with proper governmental inquiry and to use such failure as grounds for depriving a person of employment, professional calling or economic opportunity. In each of the foregoing cases, the Supreme

Court of the United States decided in favor of the protection afforded by the constitutional privilege against self-incrimination.

In *Spevack v. Klein* the Court held that the privilege was available to an attorney faced with a judicial inquiry into his professional conduct, and that the attorney could not be disbarred for asserting it in response to a demand for his records and testimony. In so deciding, the Court reiterated the very broad proposition from *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), that if a person reasonably exercises the right to remain silent he shall "suffer no penalty ... for such silence." The applicability of *Spevack v. Klein* to cases involving public employees or public officers was to be weakened by the Supreme Court's recognition in a later case that a private attorney's societal role is different from that of a public employee. *Gardner v. Broderick, infra.*

*Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), appears to be the first of the "modern" cases in which the Supreme Court of the United States considered the applicability of the fifth amendment privilege to public employees when questioned by their governmental employers. In *Garrity* certain police officers were summoned to an inquiry conducted by the state Attorney General concerning the fixing of traffic tickets. Although the policemen were warned that their answers to questions could be used against them in any criminal proceeding, they were also warned that if they did not answer they would be fired from their jobs. Given that hard choice, the policemen answered the inquiries. Their answers were later used, over objection, as evidence to convict them of criminal conspiracy. The Supreme Court reversed the convictions on the ground that the prior statements should not have been admitted, because they were the result of governmental compulsion. As in *Spevack,* the coercive element was found in the choice given to the person questioned: answer or lose your livelihood. *Garrity v. New Jersey* is much relied upon by the instant Respondents. However, it is

important to note that the issue addressed by the Court in *Garrity* was not the right of the government to elicit the information from the employees, but rather the government's right to use the elicited statements in a subsequent prosecution for a crime. In that regard, the Court said: "We agree ... that the forfeiture-of-office statute is relevant here *only* for the bearing it has on the voluntary character of the statements used to convict petitioners in their criminal prosecutions." 385 U.S. at 496, 87 S.Ct. at 618 (emphasis added). Thus, the import which *Garrity* gives the fifth amendment privilege is that information which a government employee is compelled to give in order to save his job cannot be used as evidence against him to secure his conviction of a crime.

In *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), the Supreme Court considered the question of whether a public employee could be discharged for not relinquishing or waiving his fifth amendment privilege when questioned by the government. This case involved a New York City police officer who was summoned before a grand jury to testify about the performance of his duties. The grand jury was investigating allegations of police corruption. The policeman was advised of his privilege against self-incrimination but was also told that, under New York law, if he did not waive the constitutional privilege and the immunity from prosecution, he would be fired. The policeman refused to execute such a waiver, and was discharged for that reason. The Court held the dismissal to be unconstitutional, deciding that a public employee could not be discharged for failing to enter into a waiver of his fifth amendment privilege. It is important to note that what the employee in *Gardner* was asked to do, as a condition for keeping his job, was not simply to give information relating to his work but also to relinquish the protection of the fifth amendment with respect to any subsequent criminal prosecution that could result from the information he provided. The effect of the *Gardner* decision is that a public employee cannot be deprived of his position for not yielding to a joint demand that he both

cooperate in an inquiry and, at the same time, prospectively waive the fifth amendment privilege in any criminal prosecution that may result from his disclosures.

Although the Court in *Gardner* held that the retention of public employment could not be conditioned upon a general abandonment of the implicated constitutional privilege, the Court agreed that there was a significant difference between a public employee, such as a policeman, and a private individual such as the lawyer in *Spevack*. An important difference according to the *Gardner* Court was that a policeman is a "trustee of the public interest, bearing the burden of great and total responsibility to his public employer." 392 U.S. 277–78, 88 S.Ct. 1915–16. Further delineating the difference between a public officer of the law and an attorney, the Court observed that an attorney is directly responsible to his client but the policeman is "either responsible to the State or to no one." *Id.* at 278, 88 S.Ct. at 1916. With respect to the case at bar, it might be argued, in the abstract, that elected judges are responsible to the voters and not "the State." However, when consideration is given to the great length of time between the elections of judges, it must be said as a practical matter that the government itself is the only force that can hold judges to their responsibilities in the interim. The Supreme Court's opinion in *Gardner* recognized that government has a valid interest in eliciting information from public employees *concerning the performance of their public duties.* In formulating an adjustment of this interest with the values of the fifth amendment privilege, the Court stated:

> If appellant, a policeman, had refused to answer *questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity* with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself ... *the privilege against self-incrimination would not have been a bar to his dismissal.*

(Emphasis added.) *Id.* at 278, 88 S.Ct. at 1916.

Mr. Justice Harlan, in his concurring opinion, saw in the above-quoted language an acceptable formula whereby public officials could be discharged for refusing to divulge to appropriate authority "information pertinent to the faithful performance of their offices." 392 U.S. at 285, 88 S.Ct. at 1920.

Based on the *Gardner* decision, the Supreme Court invalidated the discharges of public employees in the companion case of *Uniformed Sanitation Men Ass'n. v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). In the latter case public employees, sanitation men for the City of New York, had invoked and refused to waive the fifth amendment privilege when summoned to testify before agencies of the city government investigating kick-backs and other corruption among sanitation workers. As in *Gardner*, the employees were discharged pursuant to a provision in the City Charter mandating the discharge of any public employee who refused to waive the fifth amendment privilege in all and any proceedings, including criminal trials, investigating his official conduct. In declaring the firings to be invalid, the Court concluded that the petitioners were not discharged *merely* for their refusal to account for their conduct as employees, but had been dismissed for invoking and refusing to waive their constitutional right against self-incrimination. Going further, the Court said: "They were discharged for *refusal to expose themselves to criminal prosecution based on testimony they would give under compulsion,* despite their constitutional privilege." 392 U.S. at 283, 88 S.Ct. at 1919 (emphasis added).

The *Uniformed Sanitation Men* case, like *Gardner*, can reasonably be read as follows: The constitutional violation is not in requiring a public employee or officer to make disclosures relevant to the performance of his official duties, upon the pain of dismissal for refusing to comply; rather, the constitutional defect arises when the former requirement is coupled with a condition that he also waive for all purposes the fifth amendment privilege with respect to the use of the matters disclosed. In the *Sanitation Men*

case, the Supreme Court once again observed that public employees could be discharged for not answering questions which "specifically, directly, and narrowly" relate to the performance of their official duties, if such persons are not *also* required to waive the constitutional privilege.

Two other cases relied upon by the Respondents are *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) and *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). Each of these cases involved a New York statute which the United States Supreme Court declared to be violative of the fifth amendment privilege against self-incrimination. Under the statute in *Turley*, any person with a public contract was barred from asserting the constitutional privilege in any proceeding in which he was called to *testify* about his contracts or transactions with the state or its political subdivisions. The statute further mandated that, should the privilege be asserted, any existing public contract which the person had would be cancelled and he would be disqualified from obtaining future contracts. In other words, the right of a person to obtain a public contract was conditioned upon an outright waiver of the fifth amendment protection should he be called to testify about his dealings with governmental units. The petitioners in *Turley* were two architects whose right to seek public contracts was nullified when they asserted the fifth amendment before a grand jury investigating various charges of bribery, conspiracy, and larceny. In its review of the statute, the Court found compulsion in the obvious fact that a person had to either enter into a broad waiver of his constitutional right or be deprived of economic opportunity. In declaring the statute unconstitutional, the Supreme Court held that although a state may require public contractors to respond to inquiries, it may not insist that they also waive the fifth amendment privilege and consent to the use of the fruits of the inquiry in later proceedings against them.

In *Lefkowitz v. Cunningham*, the Court invalidated a statute under which an officer of a political party could be

removed from his position, and barred from any other party or public office for 5 years, if he refused to waive his fifth amendment privilege when summoned to testify before a grand jury or other tribunal investigating his conduct of the office. In holding the statute to be unconstitutional under the fifth amendment, the Court relied on the reasoning set forth in *Garrity, Gardner, Sanitation Men* and *Turley.* Another important element in the *Cunningham* decision, and not present in the other cases referred to, was that the statute infringed upon the right of private, political association protected by the *first amendment.*

One other case relied upon by the instant Respondents is *Slochower v. Board of Higher Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956). There, the Supreme Court held to be unconstitutional the dismissal of a professor at a New York City college for his assertion of the fifth amendment when asked, in a *congressional inquiry,* about his past activities with the Communist Party. The dismissal was based on the same provision of the New York City Charter, at issue in some of the other cases, requiring the discharge of a city employee who utilized the fifth amendment to avoid answering questions pertaining to his official conduct. In reaching its decision the Court reasoned that the professor's city employer had impermissibly used the assertion of the privilege as a basis for inferring guilt. Moreover, the Court found it significant that the inquiry in which the professor asserted the privilege was *not* one seeking to elicit information relevant to the qualifications of the employee. 350 U.S. at 558, 76 S.Ct. at 641. Thus, it is difficult to see how *Slochower* helps the instant Respondents; if anything, it cuts against their position. There is an implication in the decision that the Court would have viewed the case differently had the privilege been asserted to block an inquiry by an appropriate authority into matters relevant to the employee's performance of his duties or his fitness and qualifications for his job.

■ In the instant matter, it is true that Supreme Court Order No. 47 made it mandatory for Judges Glancey and

Chiovero to provide the information required by Question 11 of the Statement of Financial Interest or be charged with midconduct for noncompliance. It is also true that, pursuant to Article 5, section 18 of our state constitution, misconduct is grounds for removing a judicial officer from office. However, it is important to note that Order No. 47, while making it mandatory for a judicial officer to provide information, does not at the same time require him, or her, to waive the fifth amendment privilege against self-incrimination in any future criminal proceeding that might be based on the disclosures made. Thus, although compliance with the reporting requirement is compulsory in the sense that one's right to hold judicial office is conditioned upon it, there is not present the demand for a total relinquishment of fifth amendment rights which was the constitutional defect in cases such as *Gardner v. Broderick, Uniformed Sanitation Men Ass'n., Inc. v. Commissioner of Sanitation, Lefkowitz v. Turley,* and *Lefkowitz v. Cunningham.* Moreover, the inquiry put to a judge by Question 11 is a type which "specifically, directly and narrowly" relates to the performance of his official duties. Thus, under the decisions in *Gardner* and *Uniformed Sanitation Men,* the fifth amendment is not a bar to the removal of a judicial officer for refusing to provide the information sought.

■ We find no merit whatsoever to the Respondents' due process argument predicated on the alleged commingling of functions by the Board. We can ascertain no such improper admixture of functions. Moreover, the Board's recommendation has no binding effect on this Court; it is merely advisory at best, and comes here with no special presumption in its favor. Article 5, section 18(h) of the state constitution expressly provides that we may totally reject the recommendation, if in our view it is "just and proper" to do so. In sum, it is the obligation of this Court to determine if a judicial officer has in fact breached the trust reposed in him and the appropriate sanction for such a violation.

Nor is there any validity to the Respondents' argument that to remove them from office for having invoked the privilege against self-incrimination amounts to an inference that they were guilty of receiving improper gifts. This argument is specious, because the issue here is not whether gifts were actually received but rather whether the reporting requirement had to be met.

As noted earlier, the Respondents also raise a due process argument based on an assertion that they had no prior warning that invoking the privilege against self-incrimination, as an answer to Question 11, would constitute noncompliance with Order No. 47 and warrant the imposition of sanctions. Without question, Order No. 47, which was promulgated prior to the Respondents' actions, expressly states that noncompliance with the reporting requirements shall constitute a charge of misconduct. It is also true that Article 5, section 18 of the Pennsylvania Constitution, adopted in 1968, clearly provides that a judge may be removed for misconduct.

■ However, we must agree with the Respondents' contention that nowhere in our law is there any specific, categorical warning that a claim of fifth amendment privilege would amount to misconduct warranting the imposition of sanctions: especially where, as here, the answer in issue was given on the advice of counsel. One of the purposes of our present opinion is to make it boldly clear that claiming the fifth amendment privilege against self-incrimination is not an acceptable answer to Question 11 or any other question on the Statement of Financial Interest, and that any such response will be deemed noncompliance and an act of misconduct subject to sanctions. In view of the fact that the instant Respondents may not have been given sufficient advance warning that their conduct would be noncompliant, we consider it just and proper that they be given thirty (30) days to provide the required information.

Accordingly, failure of the Respondents to comply within the specified period will result in our adoption, without further notice, of the Board's recommendation that they be

removed from their judicial offices. If response is made within the specified period, the instant charges will be dismissed.