538 A.2d 473

**In the Matter of the Honorable Mary Rose Fante CUNNINGHAM, Court of Common Pleas Philadelphia County.**

**In the Matter of the Honorable Thomas E. DEMPSEY, Municipal Court Philadelphia County.**

**In the Matter of the Honorable Kenneth E. HARRIS, Court of Common Pleas Philadelphia County.**

**In the Matter of the Honorable Julian F. KING, Court of Common Pleas Philadelphia County.**

**In the Matter of the Honorable Mitchell S. LIPSCHUTZ, Court of Common Pleas Philadelphia County.**

**In the Matter of the Honorable William J. PORTER, Court of Common Pleas Philadelphia County.**

**In the Matter of the Honorable Michael E. WALLACE, Court of Common Pleas Philadelphia County.**

**In the Matter of the Honorable Thomas A. WHITE, Court of Common Pleas Philadelphia County.**

Supreme Court of Pennsylvania.

Argued Nov. 11, 1987.

Decided Feb. 25, 1988.

Mark Aronchick, Philadelphia, for Cunningham.

Robert Keuch, Chief Counsel, Harrisburg, for J.I.R.B.

Stephen Gallagher, Philadelphia, for Dempsey.

Samuel C. Stretton, Philadelphia, for Harris.

James J. Binns, Philadelphia, for King.

Stephen Robert Lacheen, Stanford Shmukler, Philadelphia, for Lipschutz.

Michael J. Stack, Charles J. Cunningham, Philadelphia, for Porter.

James C. Schwartzman, Philadelphia, for Wallace.

Brian P. Kenny, John M. Elliott, Philadelphia, for White.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

The Judicial Inquiry and Review Board ("Board") instituted formal proceedings against eight sitting Philadelphia County judges, the respondents herein. One of these judges is a member of the Municipal Court, with the remaining judges serving on the Court of Common Pleas. The Board initiated an inquiry following public disclosures involving a labor racketeering investigation being conducted by the Federal Bureau of Investigation. On October 23, 1986, a federal grand jury sitting in Philadelphia returned a multi-count indictment charging nineteen individuals associated with Roofers Union Local 30–30B ("Roofers Union" or "Union") with racketeering acts. Among other things, the grand jury charged that Stephen Traitz, Jr., the business manager for the Union, and other Union representatives used money obtained through kickbacks to make cash payments to public officials, including members of the Philadelphia judiciary.

The Board requested and obtained information developed in connection with the federal investigation. Shortly thereafter, letters of inquiry pursuant to J.I.R.B. Rule 1(b) were

issued to each of the respondents, stating that the Board had reason to believe that each of the respondents had received cash from the Union in 1985. Formal charges were issued on January 15, 1987, and on January 30, 1987, respondents were suspended with pay by this Court pending ultimate resolution of these proceedings.[1]

The Board conducted hearings on these matters in March and April 1987 at which time respondents appeared with counsel. Each of the hearing panels issued a report which was followed by issuance of a preliminary report on behalf of the entire Board. A copy of this report was served upon the respondents, each of whom was afforded an opportunity, pursuant to J.I.R.B. Rule 11, to present written objections thereto and to appear again before the Board.

On August 5, 1987, the Final Report and Recommendation of the Board was filed with this Court pursuant to

1. We rejected the Board's recommendation that respondents be suspended without pay during this interim period. *See* Judicial Administration Docket Nos. 66, 69, 70, 72, 74, 76, 77, 80, dated January 30, 1987.

Article V, section 18 of the Pennsylvania Constitution grants the authority for the suspension or removal for misconduct in subsection (d). Art. V, § 18(d). Subsection (h) of that section further provides that upon a final order of suspension or removal "his salary shall cease from the date of such order." Art. V, § 18(h). There is no such authorization for the stopping of the salary of a jurist in the case of an interim suspension where the matter has yet to be finally adjudicated. Moreover, an interim suspension is not expressly provided for in article V, section 18 as a type of discipline to be imposed as a sanction for misconduct or misbehavior in office. The creation of this remedy under J.I.R.B. Rule 24 was not intended to create a new sanction.

As the language of Rule 24 expressly states, the interim suspension was not intended to serve as a sanction for the alleged misconduct but rather it was designed to serve as a means to avoid harm to the public and/or to prevent the erosion of public confidence by actions of the charged jurist until there can be a final determination as to the validity of the charges and the imposition of the appropriate punishment. Indeed a contrary view would create serious due process questions since the validity of the accusations have yet to be finally determined. It is for this reason that this Court did not accept the Board's recommendation as to the stopping of the pay of these judges during the interim suspension. Even if the interim suspension was viewed as a type of "otherwise disciplined" as provided for under Article 5, section 18(d), there would be no authority to cause the salary of the jurist to be stopped.

J.I.R.B. Rule 16. The Board found, *inter alia*, that in December of 1985 each of the respondents had received cash in the sum of $200, $300 or $500 from the Roofers Union via Traitz or another Union representative. The Board also concluded that the Roofers Union is a potential litigant before the Philadelphia courts of which respondents are members. The Board determined that receipt of the cash gift by the respondents constituted a violation of Canons 1, 2 and 5 C(1) of the Code of Judicial Conduct. Finally, the Board recommended that each of the respondents be removed from judicial office, a disciplinary sanction authorized by Article V, Section 18(d) of the Pennsylvania Constitution.[2]

Under Article V, section 17 of the state constitution it is mandated that "Justices and judges shall devote full time to their judicial duties," Art. V, § 17(a), and that they "shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court." Art. V, § 17(b). Most pertinent to our instant inquiry, subsection (c) of section 17 provides that "[n]o Justice, judge or justice of the peace shall be paid or accept for the performance of any judicial duty or for any service connected with his office, any fee, emolument or perquisite other than the salary and expenses provided by law." Art. V, § 17(c).

To implement the enforcement of section 17, section 18 of the same article creates a Judicial Inquiry and Review Board and vests in that body the responsibility to "keep informed as to matters relating to grounds for suspension, removal, discipline, or compulsory retirement of" judicial officers. Art. V, § 18(e). After providing for a procedure to investigate such "complaints or reports" received "from any source pertaining to such matters", Art. V, § 18(e), that Board upon a finding of "good cause therefor" of the

---

2. Six members of the Board recommended removal of all respondents from the Bench. Three members recommended public censure and suspension without pay for a period not to exceed one year as the appropriate sanction for all respondents except Judge Harris, in whose case the vote for removal was unanimous.

424

charges "shall recommend to the Supreme Court" the appropriate sanction, in its judgment, for the dereliction it has found to have occurred. Art. V, § 18(g).

The Supreme Court must "review the record of the Board's proceedings on the law and facts and may permit the introduction of additional evidence." Art. V, § 18(h). The Court has the option of making its independent judgment and may "wholly reject the recommendation, as it finds just and proper." Art. V, § 18(h). The language of the Article clearly does not condition the scope of our discretion upon this Court's decision to receive additional evidence. This Court is vested with the responsibility of making its independent determination as to the inferences to be drawn from the testimony presented, without regard to whether the Court deems it necessary to require additional testimony to be taken, and this Court has the final responsibility of determining the appropriate sanction that should be imposed. Art. V, § 18(h). *See also In Matter of Glancey* 515 Pa. 201, 217, 527 A.2d 997, 1005 (1987); *Judicial Inquiry & Review Bd. v. Snyder*, 514 Pa. 142, 523 A.2d 294 (1987).

The sanctions that may be considered are suspension, removal, discipline or compulsory retirement. Art. V, § 18(h). Upon the entry of an order of suspension or removal, the salary of the jurist "shall cease from the date of such order." Art. V, § 18(h). Upon the entry of an order requiring compulsory retirement, the jurist "shall be retired with the same rights and privileges were he retired under section sixteen of this article." Art. V, § 18(h). Section 16(b) of Article V makes it clear that the compensation and retirement provisions of that section are not to be applicable to a judicial officer who has been suspended or removed from office. Art. V, § 16(b). It is equally significant that this bar is not made applicable to one subject to discipline or compulsory retirement. *See* n. (1).

It is important to underscore the distinction between the suspension or disbarment of a lawyer, *see Office of Disciplinary Counsel v. Keller*, 509 Pa. 573, 506 A.2d 872 (1986),

and the suspension or removal of a judge. The practice of law is a private pursuit, even though it has a significant impact upon a public function. Where a lawyer is found to have been derelict in his or her responsibilities, it primarily affects those who elect to repose their trust in that individual. In such cases, disciplinary action is necessary to prevent a continuation of the objectionable behavior and to repair where possible the damage to the integrity of the process that resulted from that errant conduct.[3] By suspension or disbarment the miscreant is prevented from causing further harm and his or her responsibilities can be assumed by others who will faithfully discharge them. Thus a period of suspension impacts only upon the offending lawyer. Where a judicial officer breaches the trust vested in one holding that office, the injury is further compounded because a public trust has been betrayed. *See, e.g., Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). Moreover, the responsibilities of that office may only be discharged by one who has been chosen by the people to perform those duties. At this time when court case loads have reached unprecedented levels, the need for all of our authorized judges to be functioning efficiently has never been greater. Thus to employ a punishment that would render the office inoperative would compound the injury caused to the system by the misconduct of the offending judge.[4] Such a result was never intended under our constitution.

Under Article 5, section 18(d), a judge who experiences a disability which seriously interferes with the performance of the duties may be retired and the office filled by one able to perform the tasks required by the office. In such instance the inability to perform does not arise from fault on the part of the jurist but rather from illness or other

3. This Court established a Client Security Fund to protect the interest of those who have been damaged by defalcating attorneys. Pa.R.D.E. 502 *et seq.*

4. Unlike the situation of the interim suspension, here the judge has been found to have committed the offenses charged. *See* n. 1.

disability for which the jurist cannot be held accountable.[5] Even in instances such as these there is a clear expression under the scheme set up in our constitution that recognizes the need to fill the office with one capable and competent to carry out the responsibilities demanded by the position. The sanction of removal, which carries with it an automatic bar from ever holding judicial office in this Commonwealth in the future, expressly mandates forfeiture of the office. Art. V, § 18(*l*). *Judicial Inquiry & Review Bd. v. Snyder, supra.* Thus a vacancy is created and the errant jurist can be replaced. Equally apparent is that the sanction of "discipline", which does not provide for the termination of the jurist's salary, was not intended to include a cessation of his or her performance of the duties of the office of judge. *See In the Matter of Arthur S. Kafrissen,* No. 93 Judicial Inquiry and Review Board Docket (1986). Thus the concern presently being considered is not a factor in the imposition of that type of sanction.

The language of the constitutional provisions are not as explicit as to whether the sanction of suspension permits the seat to be filled by a newly elected or appointed jurist. While suspension, like removal, requires that the salary cease from the date of the entry of such an order, Art. V, § 18(h),[6] it does not carry with it the automatic forfeiture of office that is mandated for the sanction of removal under subsection (*l*).[7] Art. V, § 18(*l*). It would be an overly broad interpretation of subsection (*l*) to read it as prohibiting this Court, in the discretion vested under the article,

---

5. Under an order of compulsory retirement the affected jurist is "retired with the same rights and privileges were he retired under section sixteen of the article." Art. V, § 18(h).

6. Art. V, § 18(h) provides in pertinent part:
 ... Upon an order for suspension or removal, the justice or judge shall be suspended or removed from office, and his salary shall cease from the date of such order....

7. Art. V, § 18(*l*) provides:
 A justice, judge or justice of the peace convicted of misbehavior in office by a court, disbarred as a member of the bar of the Supreme Court or removed under this section eighteen shall forfeit automatically his judicial office and thereafter be ineligible for judicial office.

from imposing a forfeiture of office, where appropriate, in view of the gravity of an offense that would require the imposition of a suspension. To conclude otherwise would render suspension a useless sanction. Obviously, the latter position was not the intent of the People in adopting Article V.

■ A sanction is designed not only to punish the offender and deter others who may be tempted by similar inducements, but where possible it should assist in ameliorating the injury caused by the dereliction. Under no circumstances should the sanction compound the injury. Any interpretation of the constitutional sanction of suspension which would preclude the replacement of the offending jurist would serve the interest of the offender and ignore the needs of the offended. Obviously such interpretation must be rejected. We therefore conclude that although the sanction of suspension does not require an automatic forfeiture of the office, we in our discretion can require a forfeiture with the sanction of suspension where it is appropriate.[8] Such a reading still maintains a distinction between the two sanctions. Removal provides for a perpetual bar against ever holding judicial office. Suspension, while permitting the office to be declared vacant, does not impose that perpetual impediment upon a former jurist.

We approach these cases mindful of our duty to uphold the integrity of our system and thereby maintain the public confidence. Of equal concern is our sworn obligation to pass judgment fairly upon any party who comes before the bar of this Court. To this end, we have scrupulously reviewed the records in each of the eight cases presently before us, and while the matters are being resolved in one opinion, it should be emphasized at the outset that this

8. The failure of the Board to recognize this possibility is probably the reason for the inability to arrive at a unanimous recommendation in more than one case. A suspension for a period of up to one year coupled with the loss of productivity of these jurists during the interim suspension results in an intolerable burden placed upon the people of this judicial district and would further strain the resources of the entire system.

format was selected because all of the cases arise from the same factual genesis and raise a number of identical legal and factual challenges. The individual merit of each matter has in no way been obscured or compromised by the disposition of these cases in this joint opinion. Our review will commence by addressing those common legal issues followed by a discussion of the facts and legal questions unique to the individual respondents.

## I.

## A.

■ Question has been raised as to whether, under our Code of Judicial Conduct adopted by this Court on November 21, 1973, effective January 1, 1974, 455 Pa. xxix, 310 A.2d xxxix (1973), the acceptance of a gift by a judicial officer is prohibited conduct *per se*. Before reaching that question, it must be noted that Article V, section 17(c) as previously stated, specifically prohibits a jurist from receiving, in connection with the duties of the office, "any fee, emolument or perquisite other than the salary and expenses provided by law." [9] The record before us is clear that the Union intended that the giving of these "gifts" was to secure favorable treatment for the Union or its members who may have occasion to appear before any of those judges who were the recipients of the "gifts." Thus, if the jurist knew or should have known that the "gift" was being offered to curry favor with him or her in the performance of their judicial responsibilities, the acceptance of such "gifts" would constitute a prohibited activity under section 17(c), without regard to the provisions of the Code.[10] The people of this Commonwealth expressed through section

9. Art. V, § 17(c) provides:
 No justice, judge or justice of the peace shall be paid or accept for the performance of any judicial duty or for any service connected with his office, any fee, emolument or perquisite other than the salary and expenses provided by law.

10. Art. 5, § 17 proscribes conduct which must be considered prohibited for any judicial officer without regard to any canon of judicial ethics this Court may determine appropriate.

17(c) their intent to expressly proscribe a course of conduct that would undermine the integrity of a system by destroying impartiality that is the hallmark of a just and fair system. Thus the gravity of a breach of section 17(c) is self-evident and would justify the imposition of the most extreme sanction provided for under section 18.

It would not be appropriate to attempt to limit section 17(c) to the proof of a specific expressed clandestine agreement to render a decision in a specific matter. It is clear by the language employed that the intent was to prohibit a jurist from permitting any person or entity from establishing a relationship, through the transmittal of anything of value, to place that person or entity in a favored position. It is also appropriate to read the Code promulgated by this Court as prohibiting that conduct expressly condemned under section 17(c). Section 17(b) vested in this Court the responsibility to prescribe canons of legal and judicial ethics. Clearly that direction intended that we prohibit behavior that the constitution expressly forbids. Thus the Code must be interpreted as prohibiting conduct that the constitution deems unacceptable.

Moreover, the jurist's responsibility under section 17(c) should be evident to any person qualified to hold judicial office. The fact that the Board was concerned primarily with 17(b) and the provisions of the Code promulgated thereunder does not preclude this Court from making a finding of a violation under 17(c), if the record warrants such a finding. No rights of the respondents are offended by this Court assessing the conduct presented in this record in light of the prohibition set forth in 17(c), while reviewing the specific charges found to have been sustained by the Board. We are also satisfied that fair warning has been given by section 17(c) as to the type of conduct it was designed to prohibit and that a judicial officer offending that provision cannot be heard to raise a claim of inadequate notice. We are of the view that a violation of 17(c) would warrant a sanction of removal without the necessity of establishing any specific violations under the Code.

■■■■■■■■■■■

■ In this context, it should be noted that the fact that the value of the "fee, emolument or perquisite" may appear de minimis is of no significance if it was given and received to influence the judicial officer in the performance of his or her judicial responsibilities. The clear purpose of this provision is to assure the objectivity of the jurist. Whatever the value of the token, if it is given and received to secure a favored position for the donor with the jurist in the performance of his or her official responsibilities, the impartiality of the judgment has been eroded and the integrity of the process destroyed thereby. The question is not the intrinsic value of the thing offered but rather its impact upon the actions of the jurist.

### B.

The next question to be considered is the propriety of the acceptance of these cash "gifts", in amounts ranging from two hundred to five hundred dollars, from a potentially litigious organization. As has been stated, the intent of the donor was to curry favor with the jurist in an expectation of favored treatment in the event any of the members of the organization appear before that jurist. This fact is clearly established on the record and is not seriously challenged.[11] Moreover, each jurist has the responsibility of not only avoiding an impropriety, but also of avoiding the appearance of an impropriety. Commentary, Canon 2 of the Code of Judicial Conduct. Thus when a jurist is offered a gift by a litigant he or she must be aware of the possible appearance of an impropriety. Such gifts should not be accepted unless a relationship exists, and the circumstances are such that a conclusion of wrongdoing cannot reasonably be drawn.[12] The jurist must be held accountable, even though

11. In the *Matter of Lipschutz* it is contended that a special relationship existed between Mr. Traitz and the judge which explained the reason for the gift. That contention will be discussed *infra*.

12. We reject the implication in the *Matter of Dalessandro*, 483 Pa. 431, 397 A.2d 743 (1979), that matters in one's personal life which legitimately reflect upon the jurists' professional integrity are immune from censure. The opinion in that appeal was joined by only two members of the Court and therefore does not represent a binding

he or she may not harbor an intent to show favor to the donor, in those circumstances which would legitimately give rise to a contrary conclusion. *See In the Matter of Dandridge*, 462 Pa. 67, 337 A.2d 885 (1975). In accepting gifts in questionable situations the judge exposes himself to such a charge. Such a demanding standard is justified in view of the importance of the interest to be protected.

## C.

We are satisfied that Canons 1, 2 and 5 C(1) were all designed to support the standard of impartiality mandated under Article V, section 17(c) of the Pennsylvania Constitution.[13] The "high standard of conduct so that the integrity

precedent. However, the test of the appearance of impropriety is not to be given an overly scrupulous gloss. The overly suspicious mind often assigns guilt where none exists.

**13.** The applicable canons read as follows:

CANON 1

A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPEN-
DENCE OF THE JUDICIARY

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

CANON 2

A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEAR-
ANCE OF IMPROPRIETY IN ALL HIS ACTIVITIES

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or knowingly permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

CANON 5

A JUDGE SHOULD REGULATE HIS EXTRA-JUDICIAL ACTIVI-
TIES TO MINIMIZE THE RISK OF CONFLICT WITH HIS JUDICIAL
DUTIES

. . . . .

C. Financial Activities

(1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the

and independence of the judiciary may be preserved", required in Canon 1, obviously embraces the impartiality of judicial decisions. The direction of Canon 2(A) that the judge "should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary", is also designed to protect the same interest. The prohibition against improper influence in the decisional process in Canon 2(B) is likewise directed at preserving the objectivity of court judgments. Canon 2(B) in addition expressly condemns any attempt on the part of the judge to "convey or knowingly permit others to convey the impression that they are in a special position to influence him." Canon 5 C(1) clearly directs the jurist in his or her extra judicial activities not to engage in ventures that would "tend to reflect adversely on his impartiality." Again the need for the impartiality of the judgment to be unquestioned is evident. The canons in question were intended to support the mandate of impartiality set forth in Article V, section 17(c) and were properly considered by the Board in view of the charges leveled against these respondents.

What first becomes apparent upon reading each of these canons, either separately or together, is that nowhere are gifts to judicial officials expressly prohibited. As several of the respondents have correctly indicated, a *per se* prohibition, once the rule in this Commonwealth,[14] has been superseded by the Code of Judicial Conduct which does not contain a provision similar to former Canon 32. *See In the Matter of Dandridge, supra.* In addition, Canon 5C(4) of the ABA Model Code of Judicial Conduct, prescribing those circumstances under which acceptance of a gift would be

proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves.

14. Canon 32 of the Canons of Judicial Ethics formerly provided:
 A judge should not accept any presents or favors from litigants, or from lawyers practicing before him or from others whose interests are likely to be submitted to him for judgment.
 425 Pa. XXiii, XXXV, effective February 11, 1965.

permissible, was rejected by this Court.[15] We cannot agree, however, that the Code as adopted does not prohibit receipt of monetary gifts under circumstances which would tend to reflect adversely upon the integrity of the judiciary.

This Court's rejection of a *per se* prohibition against a jurist receiving a gift reflected our recognition that there would be occasions where such acceptance would be proper. The interest to be protected is the impartiality of the judicial process; the impropriety of accepting a gift arises only when that interest is compromised. Thus a *per se* prohibition is not only unnecessary, it would constitute an unnecessary restriction upon the conscientious jurist.[16] However, this Court cautioned early that the decision not to reinstate a counterpart of old Canon 32 did not legitimize the acceptance of an improper gift. In *Dandridge* we stated that "[a]lthough the language of Canon 32 does not survive in the new Code, the earlier prohibition against accepting improper gifts is encompassed in the language of new Canon 5, subd. C(1)." *Id.*, 462 Pa. at 73, 337 A.2d at 888.

## II.

Having established the canons in question would prohibit a gift, where the acceptance would compromise the objectivity of the jurist, we now turn to specific objections raised by respondents as to the applicability of these canons to the instant cases. It has been urged that these provisions are hortatory in character and thus have no independent effect. Notwithstanding the aspirational quality of the canons, it

**15.** Canon 5C(4) of the ABA Model Code allowed a judge to accept "a gift incident to a public testimonial to him, books supplied without cost to him for official use, and an invitation to him and his spouse to attend without cost a bar-related function or activity devoted to the improvement of the law, the legal system, or the administration of justice."

**16.** Pursuant to this Court's Order No. 47 of April 13, 1984, every jurist in this Commonwealth is required to file, on an annual basis, a "Statement of Financial Interest." 503 Pa. xxxiv, 472 A.2d LIV. On that Statement a jurist is required to disclose all gifts with a value of $200 or more. *Id.* at xxxvii, 472 A.2d at LVIII. · Failure to make the disclosure subjects the jurist to sanctions. *Id.* at xxxv, 472 A.2d at LV.

should be clear that they describe the type of conduct to which a judicial officer will be required to conform and that a departure will occasion a censure. Nor should one who asserts his or her competency to hold judicial office have difficulty in understanding concepts such as "integrity", "independence" and "impartiality." An argument relying upon vagueness will not prevail. The specificity which is being urged is not only unnecessary, it is also inappropriate for a code of this nature.

It should not be necessary for those aspiring to hold the esteemed office of judge to be given specific examples where one's impartiality may be reasonably questioned.[17] The judgment of a judicial officer should be sensitive to such situations. If not, there could be serious question as to the competency of that individual to hold judicial office. This Court has consistently held judicial officers to the standards set forth in the Code since its adoption. These belated complaints as to its clarity and binding effect ring hollow in this setting.[18]

Respondents have also challenged the applicability of Canon 5 C(1) arguing that it was intended to refer only to "financial and business dealings." They therefore argue that a gift cannot be considered to fall within "financial and business dealings." While this argument may on its face

**17.** One respondent argues that the Board's distinction between a $300 gift from the Roofers and in-kind gifts of approximate value from other organizations cannot be gleaned from a fair reading of the Canons. This analysis begs the question. In *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616 (1975), *cert. denied,* 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976), we stated that "[w]here one is on fair notice that his own conduct is within that prohibited by regulation, he cannot attack the regulation simply because the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit." *Id.,* 463 Pa. at 482, 345 A.2d at 621, *quoting Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). There is no question that a gift from a potential litigant where there is no other reason for the gift other than an effort to curry favor from the jurist is clearly proscribed by these canons.

**18.** The Code of Judicial Conduct was adopted November 21, 1973 and became effective January 1, 1974. 455 Pa. xxxix. Section 3302 of the Judicial Code, 42 Pa.C.S. § 3302, provides in part as follows: "Judges ... shall not violate any canon of ethics prescribed by general rule."

appear valid, this Court has expressly stated that Canon 5 C(1) encompassed the earlier prohibition against accepting improper gifts. *In the Matter of Dandridge, supra,* 462 Pa. at 73, 377 A.2d at 888. Thus since our decision in *Dandridge* there could be no question as to the applicability of Canon 5 C(1) to the acceptance of an improper gift by a jurist.

■ Alternatively it is argued that even if Canon 5 C(1) does encompass some gifts, it should not prohibit the acceptance by a judicial officer of "token or memorial gifts." Even if we accept respondents characterization of cash payments in the amounts of $200, $300 and $500 as being token gifts, the argument must still be rejected. As stated earlier, the issue is not the value of the gift accepted, but rather whether it was improper to accept it. Where the acceptance of the gift can legitimately call into question the impartiality of the judge in matters before the Court relating to the donor, the jurist is precluded from accepting the proffered gift under Canon 5 C(1). It has long been a recognized business practice to offer gratuities on occasions such as Christmas to secure or maintain a preferred position in a business relationship. Although such conduct may be appropriate for a tradesman who is offering his wares for sale, justice may never be permitted to be for sale.

Several respondents additionally challenge the application of Canon 5 C(1) because, they contend, that provision was intended to apply only to ongoing dealings. Although this contention was not raised before the Board, it has been presented to us and we conclude that it is also without merit. A single incident that undermines the integrity of judicial rulings causes irreparable harm. We therefore reject the proposed distinction that this argument would require.

■ Respondents argue that the procedures employed by the Board and Robert Keuch, its General Counsel–Executive Director, constitute impermissible commingling of investigative, adjudicatory and prosecutorial functions, in violation of the due process clauses of the United States and

Pennsylvania Constitutions. Specifically, it is alleged that the Board filed charges against respondents after having reviewed the evidence *ex parte* with the prosecutor. In addition, it has been asserted that Keuch has acted in these matters as both legal advisor and prosecutor resulting in an impermissible commingling of responsibilities. Respondents charge that Keuch actively participated in *ex parte* communications with the Board subsequent to the filing of charges in matters pertaining to the appropriate charges and sanctions, the nature and weight of the evidence against each respondent and the conclusion that respondents have violated the Code of Judicial Conduct. These discussions allegedly occurred while Keuch was acting as prosecutor in investigating and presenting the cases before the Board.

The issue of commingling of Board functions was recently decided by this Court in *Matter of Glancey, supra,* 515 Pa. at 217, 527 A.2d 997 (1987). We dismissed this challenge as follows:

We find no merit whatsoever to the Respondents' due process argument predicated on the alleged commingling of functions by the Board. We can ascertain no such improper admixture of functions. Moreover, the Board's recommendation has no binding effect on this Court; it is merely advisory at best, and comes here with no special presumption in its favor. Article 5, section 18(h) of the state constitution expressly provides that we may totally reject the recommendation, if in our view.it is "just and proper" to do so. In sum, it is the obligation of this Court to determine if a judicial officer has in fact breached the trust reposed in him and the appropriate sanction for such a violation.

*Matter of Glancey,* 515 Pa. at 217, 527 A.2d at 1005.

It is this Court's judgment as to whether the respondents' conduct is deserving of censure, and the sanction to be imposed, which ultimately governs. This Court is the sole arbiter of judicial discipline. The fact that the Board investigates charges against a member of the judiciary and

suggests a recommendation of sanction to this Court is not the determining factor either as to whether a dereliction will be found to have occurred or the sanction to be imposed if this Court determines that the facts warrant a different result.[19]

An objection has been raised as to the use of electronic surveillance in their proceedings. Respondents present two issues: (1) whether the federal court erred in providing the Board with a transcript of the electronic surveillance of the Roofers Union headquarters, and (2) whether the evidence was inadmissible hearsay.

The thrust of the first argument is in the nature of a request for suppression based upon a possibility that the surveillance evidence was illegally obtained. The first faulty premise upon which this argument is grounded is that a doctrine of exclusion is properly applicable in this setting. That doctrine has evolved in the criminal law because of the strong policy against improper police conduct. Even this concept in the criminal law was not embraced until it was determined that these improper practices were widespread. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). No such demonstration has been made in this instance. Moreover, the propriety of excluding evidence, where the validity of the information obtained is accurate, is questionable in an area where the objective is to protect the public from corrupt judges.

However, we need not make that judgment here, since it is clear in this instance that the challenged evidence was not

---

**19.** It is also charged that the Board violated J.I.R.B. Rules 1(c) and 24(a). The alleged violation of rule 1(c) is that the entire Board, rather than a two-member committee of the Board, initially investigated the charges against these judges. The claimed violations of rule 24(a) are (1) that the entire Board determined that this Court should be requested to enter an order of interim suspension, and (2) that the request was prematurely made. These objections must also be rejected for the reason assigned above. The ultimate judgment as to the finding of a violation as well as the decision to enter an interim suspension order were the independent judgments of this Court. Any procedural irregularity by the Board, if in fact such occurred, in no way tainted the actions taken by this Court.

illegally secured. These materials were turned over to the Board by order of the District Court for the Eastern District of Pennsylvania. The fact that the order is on appeal is of no moment to the instant issue. Even if there is a reversal of that judgment at some later date, such a finding would not indicate an illegality on the part of the Board that would justify the suppression of this evidence.

■ As to the hearsay objection it should be noted that after review of the transcript of the electronic surveillance, much of the material had no relevance to the proceeding and was therefore disregarded. This Court's focus in reviewing this evidence was twofold: first, those conversations between the Union officials as to their reason for offering these Christmas gifts to the judges; second, those conversations between the judges and Union officials relating to these gifts. The latter situations were not hearsay statements. Insofar as these statements explain the judges' reason for the acceptance of the money or the Union officials' reasons for offering the money, these statements are properly characterized as verbal parts of an act and are therefore outside the hearsay rule.

> The legal significance of acts taken alone and isolated from surrounding circumstances may be unclear. Thus the bare physical act of handing over money to another person is susceptible of many interpretations. The possibilities include loan, payment of a debt, bribe, bet, gift, and no doubt many other kinds of transactions. Explanatory words which accompany and give character to the transaction are not hearsay when under the substantive law the pertinent inquiry is directed only to objective manifestations rather than to the actual intent or other state of mind of the actor.

McCormick, *Evidence* § 249 (3d ed. 1984). There were also numerous discussions between Union officials and members in which they discussed their plans to influence the judges. The statements tend circumstantially to show the state of mind of the speakers in offering the gifts and thus are admissible non-hearsay. *See Common-*

*wealth v. Wright,* 455 Pa. 480, 317 A.2d 271 (1974); *Adoption of Harvey,* 375 Pa. 1, 99 A.2d 276 (1953); *Smith v. Smith,* 364 Pa. 1, 70 A.2d 630 (1950). *See generally,* 6 J. Wigmore, Evidence § 1790 (Chadbourn rev. 1976).

## III.

Having resolved the common legal issues, we now focus our attention on the facts and arguments unique to each of the respondents.

### *No. 115 In The Matter of the Honorable Kenneth Harris*

██ Judge Kenneth Harris was elected to a ten-year term in the Court of Common Pleas of Philadelphia County commencing in January 1984. His term followed eight years of judicial service on the Municipal Court of Philadelphia.

Unlike the other respondents presently before us, Judge Harris has denied throughout the proceedings any receipt of money from the Roofers Union. The Board nevertheless found, on the basis of all of the evidence presented, that Judge Harris did in fact receive a cash gift of $300 from the Roofers Union in 1985. After reviewing the evidence, we are satisfied that the Board's finding is correct and that the testimony of Judge Harris and his witness, an aide by the name of Conrad Cheeks, was not credible.

In addition, the Board found that Judge Harris failed to disclose the receipt of this gift on the Statement of Financial Interest in contravention of Supreme Court Order No. 47. According to the Board, this omission, which it found to be deliberate, constituted a failure on the part of Judge Harris to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

We have discussed the duty of providing complete and truthful information on the financial disclosure in our recent decision in *In the Matter of Glancey,* 515 Pa. 201, 527 A.2d 997 (1987). Therein we stated that "requiring the disclosure of gifts of a certain value is designed to assure

the people of the impartiality and honesty of office holders, and to promote public confidence." *Id.*, 515 Pa. at 210, 527 A.2d at 1001. Judge Harris' disregard of this Court's Order, see n. (16), as well as his numerous attempts to deny the acceptance of the gift compound the original dereliction. In our judgment, respondent's conduct must be met with the sanction of removal.

## No. 116 In the Matter of the Honorable Julian F. King

■ Judge Julian F. King was charged with and found to have received cash gifts from the Roofers Union in 1983 ($200), 1984 ($200), and 1985 ($300). A judge on the Court of Common Pleas of Philadelphia since 1971, Judge King has not denied receipt of the funds and has indeed stipulated to this allegation. He failed to report receipt of the 1984 payment on his Statement of Financial Interest for that year,[20] although he did disclose receipt of the cash on his 1985 Statement, identifying the "Roofers Local" as the source of the payment. Based upon these findings, the Board concluded that respondent's conduct violated the Code of Judicial Conduct. We likewise conclude that respondent acted improperly in accepting cash from the Union and in failing to report the 1984 gift.[21]

Respondent's acceptance of cash from the Union in three consecutive years evidences his intent to establish and maintain a relationship with the Union. Such a relationship offends the concept of judicial impartiality, and his failure to report receipt of the gift received in 1984 demonstrates his cognizance that his actions were improper. According-

---

**20.** The Supreme Court mandated disclosure for the first time in 1984. *See* Supreme Court Order 47 of the Judicial Administration Docket No. 1, dated April 13, 1984. Therefore no violation occurred in 1983 in this respect.

**21.** The Board also charged Judge King with misconduct for invocation of his Fifth Amendment privilege against self-incrimination before the federal grand jury. However, it did not base a finding of misconduct upon this charge, and therefore we need not consider it at this time. *See In the Matter of Glancey,* 515 Pa. 201, 527 A.2d 997 (1987).

ly, we find that Judge King's conduct in this matter warrants the sanction of removal.

### No. 117 In the Matter of the Honorable Mitchell S. Lipschutz

Judge Mitchell Lipschutz is a judge of the Court of Common Pleas of Philadelphia County, having been elected to a ten-year term commencing in January 1986. Previous to his election to that court, he had served as a Municipal Court judge since 1980.

Judge Lipschutz was charged with receipt of $500 cash from Traitz in 1985 and with providing misleading information to FBI agents during their investigation of this matter. He disclosed the receipt of the cash on his Statement of Financial Interest for 1985. He responded to formal proceedings by the Board with a general denial of the charges, and has scrupulously avoided any explanation of the circumstances of the gift. Respondent was subpoenaed to appear and testify before a federal grand jury regarding receipt of this gift. He invoked his Fifth Amendment privilege against self-incrimination in refusing to answer whether he knew Traitz or Thomas Brown, or whether he received cash from Traitz.

Judge Lipschutz contends that his acceptance of the cash was separate from his judicial role and instead was accepted as a wedding gift from a friend. As we have previously stated, not all gifts are prohibited by the Code. A gift to a friend could be legitimate, but only if the donee is able to establish (1) that the gift was given only in connection with that relationship and (2) that the donee is satisfied that the circumstances surrounding the acceptance of the gift would not create a reasonable basis for the donor to believe that the gift places the donor in a position to exert improper influence over the donee in the discharge of his legal duties.

There is absolutely no evidence of record to support the contention now offered that the gift was incident to Judge Lipschutz' wedding. He points our attention to select passages from the electronic surveillance transcripts in support

of this position. Having reviewed these passages, we find they prove nothing more than a possible friendship between Traitz and respondent, and Traitz's knowledge of the judge's wedding. Instead, our review of the surveillance evidence discloses an intended plan by Union officials to influence judges of the Philadelphia court system. Nowhere has Judge Lipschutz been singled out to receive the gift of cash based solely on his purported friendship to Traitz.

In addition, we find the record devoid of evidence that respondent made it known to Traitz that this gift would not earn Traitz any special favor in respondent's courtroom. On this point we find it particularly interesting that Judge Lipschutz invoked his constitutional privilege against self-incrimination during the federal grand jury investigation, wherein he could have presented testimony as to his relationship with Traitz.[22] He was further presented with the opportunity to elaborate on this relationship during the FBI investigation. However, when agents questioned him about whether he received cash from Traitz, he replied that he would "have to cudgel his memory." This background would certainly justify an inference that the instant "wedding gift" claim is one of recent fabrication.

This lack of candor in the instant proceedings unquestionably compounds the dereliction. A judge should refrain from acting in any way which might lead one to call into question his integrity. Clearly an active concealment of or the failure to provide pertinent information during an official investigation would undermine, not promote, the public trust bestowed upon a judge.

Judge Lipschutz has clearly failed to prove that the gift was proper. He has exacerbated the offense by exhibiting a complete lack of frankness with the federal authorities. We therefore accept the Board's recommendation and order the removal of Judge Lipschutz from office.

22. We make reference to this conduct not as an independent basis for discipline, but instead to emphasize Judge Lipschutz's failure to meet his burden of proving the gift was proper as one incident to a friendship.

*No. 119 In the Matter of the Honorable*
*Thomas A. White*

 Judge Thomas White is a member of the Court of Common Pleas of Philadelphia County having been elected to a ten-year term commencing in January 1978. He has been charged, *inter alia,* with having received $300 cash from the Roofers Union in 1985, and with providing false information to FBI agents. The Board found that this conduct violated Article V, section 17(b) of the Pennsylvania Constitution and Canons 1, 2, and 5 C(1) of the Code.

Judge White first contends that he did not accept the cash for his own use, and therefore his conduct was not prohibited. He claims that Brown left an envelope containing the cash on his desk without his knowledge. Upon his discovery of the cash several days later, he had it converted to gift certificates which he then distributed to his office personnel. He attempts to distinguish his case from the other judges who he argues converted the Roofers' money to their own use. This contention is obviously specious. When one accepts a dominion over property that is offered and makes a judgment as to its disposition, it is of no consequence how he chose to use it.

Judge White violated the Code by his receipt of the money, enabling Roofers Union officials to entertain the impression that they were in a special position to influence him. His conduct tainted the integrity of his office. *See* Canon 2(B). His subsequent disposition of the cash could only absolve him of this wrongdoing if it had the effect of undoing the harm done, in other words, disabusing the donor of any notion that it would improperly influence him. There was no effort to eradicate the impression reasonably created by his acceptance of the money.

Respondent would also have us reject the Board's finding of misconduct with respect to his statements to FBI officials. Judge White responded negatively to the agent's question, "Did Tom Brown hand you an envelope...." He claims that he did so because Brown placed the envelope on his desk and not in his hand. At the time, however, he

knew that Brown had left cash in his chambers. Judge White describes his statement as a literally truthful response given in a stressful situation. Truthful perhaps, but still misleading. We have no doubt that Judge White understood or should have understood the import of the FBI inquiry. Thus he could have been completely candid only by responding that although Brown did not hand him the cash, respondent did receive the same and disposed of it in the manner outlined previously.[23] In view of the foregoing derelictions, we find it appropriate that Judge White be removed from office.

### No. 120 In the Matter of the Honorable William J. Porter

Judge William J. Porter has served on the Court of Common Pleas since 1971, and was elected to a ten-year term beginning in January 1984. In December of 1985, the Board found that respondent received a billfold type envelope from Thomas Brown containing $300 cash. Respondent disclosed receipt of the cash gift on his 1985 Statement of Financial Interest. The Board found that respondent received $300 cash from the Roofers Union, and concluded that the result of Judge Porter's conduct can only be a loss of public confidence in the integrity and impartiality of the judiciary and a loss of respect for the Court on which he sits.[24] We find that the conduct indulged in by respondent warrants the sanction of suspension and forfeiture of office.

**23.** Judge White also contests this conclusion on the grounds that no interview notes were produced by the FBI. *See United States v. Harris,* 560 F.2d 148 (3d Cir.1977). He has nevertheless acknowledged the response in question, and thus the availability of the interview notes is irrelevant.

**24.** Judge Porter had also been charged by the Board with violating the Code of Judicial Conduct because of his invocation of the Fifth Amendment to the United States Constitution during questioning before a federal grand jury regarding his relationship to the Roofers Union and the receipt of cash from the Union. The Board later dismissed this charge. We have addressed this issue in regard to Judge Lipschutz, above.

### No. 122 In the Matter of the Honorable Michael E. Wallace

 A judge of the Philadelphia County Court of Common Pleas, Judge Michael E. Wallace was elected to a ten-year term commencing in January 1978. He has been charged with receiving a cash payment of $300 from the Roofers Union in 1983 and 1985. He is also alleged to have provided false information to FBI agents in the course of their official investigation of this matter.

The Board found that respondent accepted $300 cash from Thomas Brown in December 1983. Likewise, in December 1985, respondent accepted $300 from Brown who, at the same time as he delivered the cash, invited respondent to a Christmas party at the Union hall. Respondent reported receipt of the cash on his 1985 Statement of Financial Interest.

FBI agents interviewed respondent on February 13, 1986. The agents asked him if he knew "Tommy Brown," to which he replied that he did not. However, he did identify a photo of Brown as "Tom Brown, a person he knew from the courts." More importantly, respondent denied having received cash from Brown or Traitz in 1985, and told agents that Traitz had invited him to the Christmas Party during a telephone call.[25] We are satisfied that respondent has committed the violations charged by the Board and, based on this conduct, this Court finds it appropriate to impose the sanction of removal upon respondent.

### No. 123 In the Matter of the Honorable Thomas E. Dempsey

 Judge Thomas E. Dempsey is a member of the Municipal Court in Philadelphia, having been appointed to the bench on June 13, 1984 and elected to a six-year term commencing in January 1986.

---

**25.** We have elaborated on the impropriety engendered by providing false or misleading statements to FBI investigators, *supra*, with regard to Judges Lipschutz and White, and see no need to elaborate further.

On December 9, 1985, Thomas Brown gave respondent an envelope containing $300 in cash and told him "Merry Christmas from Steve." Brown invited respondent to a Christmas party at Roofers Hall simultaneous with giving Judge Dempsey the envelope. Respondent was found by the Board to have no social relationship with Traitz, although he was aware of Traitz's connection to the Union.

Judge Dempsey disclosed receipt of the cash on his 1985 Statement of Financial Interest. The Board found that respondent received $300 cash from the Roofers Union in December 1985, and concluded that the result of Judge Dempsey's conduct can only be a loss of public confidence in the integrity and impartiality of the judiciary and a loss of respect for the Court on which he sits. We have adopted the Board's findings regarding the violative conduct, and in view of the foregoing, this Court orders respondent's suspension with forfeiture of the office.

### No. 127 In the Matter of the Honorable Mary Rose Fante Cunningham

■■■ Judge Mary Rose Fante Cunningham was elected to the Court of Common Pleas in November 1985 to a ten-year term beginning in January 1986. The conduct in question occurred while respondent was a judge-elect, insofar as she accepted a $300 cash gift from Traitz on December 18, 1985, subsequent to her election to the bench, but prior to her induction.[26]

26. Judge Cunningham has asserted that Article V, section 17(b) and the Code are inapplicable to the activities of judges-elect. This contention is erroneous.

In *In re Greenberg,* 442 Pa. 411, 280 A.2d 370 (1971), this Court suspended Common Pleas Court Judge Stanley Greenberg, who, in 1970, had been found guilty of committing mail fraud during the period September 1961 to July 1965. The criminal conduct occurred prior to Judge Greenberg's appointment as a judge. However, the Board found that Judge Greenberg's conduct, notwithstanding its occurrence prior to his assumption of judicial responsibilities "prejudic[ed] the proper administration of justice and [brought] the judicial office into disrepute." *Id.,* 442 Pa. at 415, 280 A.2d at 371. This Court agreed with both the findings and conclusions of the Board, and ordered the recommended disciplinary sanction. Thus there is no

Judge Cunningham met with Traitz in the offices of the Roofers Union on December 18, 1985. During this meeting, at which Cunningham accepted $300 from Traitz, the following conversations were surveilled:

ST: First of all, that's to help you with your campaign.

MRC: Oh.

ST: ...clean your stuff up.

MRC: Oh. Steve, thank you.

ST: Merry Christmas.

MRC: Thank you so much.

ST: And if you need anything, give me a holler.

MRC: Okay.

ST: And I'll, and I'll, maybe occasionally I'll call you and ask you for a favor, but I'll never, I'll never embarass you. I'll never come to you with any drugs or nothin'....

MRC: I know it.

ST: ... 'cause I don't (UI).

MRC: Well, you know, you know I'm going to juvenile.

ST: That's fine.

MRC: Which ...

ST: Wherever you're ...

MRC: It's a good place to start.

ST: Wherever you're goin', you're my friend.

MRC: I know.

Bd. Exh. 11, p. 3.

\* \* \* \* \* \*

ST: That's right. And that's why, girl, you gotta be compassionate. Well, you are.

MRC: I'm gonna do my best.

ST: You'll do a hell of a job.

room to argue that Judge Cunningham should be accorded disparate treatment by this Court on the theory that she had not yet taken her oath of office when the transgression took place. The Board's finding that deleterious consequences to the judiciary will result on account of respondent's conduct is correct regardless of the actual date on which the conduct occurred, and therefore, discipline is properly imposed against respondent by this Court.

MRC: We'll do our best. This is goin' into my fund to pay my family off.

ST: That's for you. That's for you.

MRC: I shouldn't take it, but ... it's goin' to my family. It'll go to my family.

ST: Right ...

MRC: You know I have a loan to pay off.

ST: Let me help you with that. Give me, give me a legal letter ...

MRC: Alright. What I think I'm gonna do is, after ...

ST: (UI) and I'll go over to the Building Trades and it'll be ... everbody's got a PAC.

MRC: After, after ...

ST: (UI) PAC. That's ...

MRC: We're gonna get somethin', ah, together, but we're not gonna do it till after the swearing in. they're gonna open ... they're gonna close my committee down, open a new committee to retire the debt, and then they're gonna send letters out.

ST: You see that I get one. I'll ...

MRC: Alright.

ST: ... take it to Gillespie and I'll take it to the rest of the trades and I'll do the best I can.

MRC: Okay. 'Cause we're, we're tryin' to pay ... I have a choice of either raising some more money to pay it off or paying it out of my salary. I owe, I owe one relative five and another relative five. I don't wanna pay it outta my salary.

ST: No. Yo. Let me help ya' with that legally.

MRC: Okay.

ST: Let me, do me a favor, buy yourself a Christmas thing with that. That's ...

MRC: Alright.

ST: Nobody knows nothin' about that. What I, what I want to do is, give me a letter.

MRC: Okay.

ST: All, all, I know ...

MRC: I mean, you didn't have to do this. But ...
ST: I didn't do nothin'. It's nothin.
Bd.Exh. 11, p. 7, 8.

 * * * * * *

MRC: Ah, I'm gonna bring my husband with me to the
luncheon Monday because ...
ST: I'm lookin' forward to it.
MRC: He's interested, Steve, in runnin' two years down
the road ... for judge and I said to him, "Then you
gotta come with me and meet the guys."
St. I'm startin' a strong machine, here.
Bd.Exh. 11, p. 9.

 * * * * * *

Cunningham: And I, I'll remember my friends and....
Traitz: I know you will and I'll, I'll never embarass you.
Cunningham: I know you won't. I know you won't.
Bd.Exh. 11, p. 23–24.

 * * * * * *

On February 11, 1986, respondent became aware that the Roofers Hall had been electronically surveilled. The next day FBI agents visited respondent at her home and informed her both that the Bureau was conducting an investigation into her receipt of the cash gift from the Roofers and that her conversation with Traitz had been electronically recorded. During this meeting with the FBI, Judge Cunningham admitted that she had in fact received an envelope from Traitz on December 18, 1985, containing $300 cash.

The Board found that respondent received $300 cash from the Roofers Union in December, 1985, and concluded that the result of Judge Cunningham's conduct can only be a loss of public confidence in the integrity and impartiality of the judiciary and a loss of respect for the Court on which she sits. We find that the evidence conclusively establishes that Judge Cunningham accepted the cash and further entered into an "illicit agreement" with Traitz. Her understanding with Traitz essentially permitted Traitz to seek judicial favors from respondent, who assured him that she

would "remember my friends." The egregious nature of such a relationship cannot be tolerated.

Although Judge Cunningham did not engage in the attempted deception some of the other respondents employed, the gravity of her offense requires the most severe sanction available. The record is clear that an express agreement was made between this judge and Traitz, whereby members of the Union who appeared before the judge would receive "special understanding." Equally clear was that in return continuing special favors were to be received by the judge from the Union, *e.g.*, support in a future judicial candidacy of the husband of the judge and additional moneys to cover outstanding campaign debts. A bond of allegiance was established and, in the process, justice was irretrievably compromised. For these reasons we accept the recommendation of removal.

Accordingly, in the matters at J.I.R.B. docket numbers 115, 117, 119, 120, 122, and 127, the recommendations of the Board are accepted, the respondents, pursuant to Article V, section 18 of the Pennsylvania Constitution, are herewith removed from the office of Judge, their salary shall cease from the date of the entry of this order and they shall hereafter be ineligible for judicial office.

In the matters at J.I.R.B. docket numbers 114 and 124 the respondents, pursuant to Article V, Section 18 of the Pennsylvania Constitution, are herewith suspended from the office of Judge, their salary shall cease from the date of the entry of this order and their office is declared to be vacant.

ZAPPALA and PAPADAKOS, JJ., join in this opinion and file a concurring opinion.

LARSEN, J., did not participate in the consideration or decision of these cases.

ZAPPALA, Justice, concurring.

Although I concur in the result reached by the majority,

the extreme importance of the matter [1] as well as logic and common sense compel me to write separately. I fear that the majority's confusion of the Constitution's words "suspension" and "removal" has emasculated an otherwise viable means vested by the People of this Commonwealth to aid the judiciary in the appropriate disciplining of its justices, judges, and district justices. Furthermore, I am deeply concerned that the majority has centered its inquiry not on the activities of the jurist, but on those who would take advantage of him.

The Code of Judicial Conduct governs the activities of jurists. It is not a means of regulating the behavior of others by exerting control over them through our judicial officers. There will always be individuals who for their own motives will seek to manipulate and gain advantage of public officials. The public's faith in the judiciary is not undermined by self-serving individuals attempting to challenge or weaken the integrity of the judiciary, but by jurists succumbing to that corrupt influence.

We must be cautious then not to discipline those jurists who are merely the *targets* of others' contemptible conduct. The circumstances underlying the disciplinary action we have imposed on the Philadelphia judges involved in these cases do not raise this concern. These Philadelphia judges were not *unwitting* participants in the Roofers Union's scheme. Nevertheless, I am troubled that the expansive language of the majority opinion has paved the way for that unfortunate result.

The majority has held that a gift to a friend who is a jurist may be legitimate, "... but only if the donee is able to establish (1) that the gift was given only in connection with that relationship and (2) that the donee is satisfied that the circumstances surrounding the acceptance of the gift would not create a reasonable basis for the donor to believe that the gift places the donor in a position to exert improper

1. With one fell swoop of the pen, the Court today removes from office more elected officials, to the best of my knowledge, than have been removed from the other branches of government in the history of the Commonwealth.

influence over the donee in the discharge of his legal duties." Slip Opinion at 30. This places the jurist in the untenable position of discerning the motives of those whose relationships would not ordinarily cause one to undertake that analysis. Even in the context of the closest social relationship, there is very little which can withstand such scrutiny without seeding doubt that another's motives are not purely altruistic. It is common experience that the mere existence of social relationship may lead one to believe that he is in the position to exert influence on another. Yet if one of the individuals is a jurist, the other's conduct must be probed and his motives are immediately suspect. This is unnatural and unreasonable. I would not burden a jurist with this paranoia. The proper focus is on the conduct of the judicial officer as the recipient of a gift, not upon the giver's motives. Although evidence of the giver's actions may be relevant to establish whether the acceptance of a gift was improper, the impropriety of the judge's conduct does not rest upon the giver's intent.

At the outset of its Opinion, the majority struggles to stretch the meaning of the term "suspension" to include the imposition of a forfeiture of office. I find the analysis by which it does so unnecsary, unwarranted, and unpersuasive.

The Constitution, in Article 5, Section 18, specifies three actions that may be taken regarding a judicial officer whose misconduct has been proven—suspension, removal, and discipline. (A fourth action, compulsory retirement, is specified for conduct interfering with the performance of judicial duties that is less culpable because arising out of disability.) It is readily seen, and is conceded by the majority, that these three punishments vary in degree of severity. In its ordinary and common usage, the term "suspension" connotes a temporary condition, after which the prior condition is resumed. To impose a forfeiture of office is a punishment in addition to, and not subsumed within, the punishment of "suspension" as that term is commonly understood. I find no basis in the language of the Constitution for this

Court to order a judicial officer to forfeit his office without ordering that he be "removed" from office. In plain terms, the only constitutionally authorized penalty whereby a judicial officer's service is terminated is "removal".

It happens that the Constitution imposes an additional sanction on one who has been removed from office, a perpetual bar to further judicial service. This sanction is not an essential part of the punishment imposed by this Court for misconduct, but is an additional impediment required by the Constitution where one has been removed. To suit its own purposes, however, the majority creates a penalty not found in the constitutional text that undeniably removes a judge from office while avoiding the permanent bar.

The majority attempts to justify its conclusion that the penalty of "forfeiture of office" must be within the discretion given to the Court in Section 18, by expounding on the dire administrative consequences that could flow from an order of suspension without forfeiture of office. In my view our "discretion" is limited to determining which of the prescribed penalties, if any, is appropriate, and does not extend to the formulation of new penalties.

Citing the heavy caseloads of the courts and the need for all judicial offices to be filled and operating efficiently, the majority states that it was never intended under our Constitution that "the injury caused to the system by the misconduct of the offending judge" be compounded by the use of "a punishment that would render the office inoperative." at 477–478. "Any interpretation of the constitutional sanction of suspension which would preclude the replacement of the offending jurist would serve the interest of the offender and ignore the needs of the offended." *Id.* at 478.

I am at a loss to understand how it serves the interest of the offending jurist for his office to remain unfilled during the term of a suspension without pay.[2] Moreover, I do not

---

**2.** Indeed, it would appear that the majority's "suspension with forfeiture of office" inures more to the benefit of the offending jurist than would suspension without pay for an extended period. A jurist under

agree that the needs of the system are ignored if the term "suspension" is interpreted according to its ordinary and common usage. This Court is granted specific authority to authorize temporary assignments of judges from other courts, Article 5, Section 10(a) and from the pool of retired judges who are willing to serve, Article 5, Section 16(c). There are innumerable circumstances in which the courts of this Commonwealth may be required to function with one or more of their offices temporarily unfilled, perhaps for an extended period of time. Temporarily barring a jurist from carrying out the functions of his office need be treated no differently.[3]

The majority acknowledges that in the cases where a judge has been removed or compelled to retire, the constitutional scheme explicitly recognizes the vacancy thereby created and "the need to fill the office with one capable and competent to carry out the responsibilities demanded by the position." at 477–478. Having recognized the need and provided for it in these two instances, logic would indicate that the failure of the Constitution to provide for it in the case of suspension demonstrates that the need is recognized to be not as great or is otherwise provided for. In the "silence" as to the consequences of a suspension, the majority sees an opportunity for the Court to conduct its own assessment of the needs of the system and fashion its own penalties. I see a purposeful restraint. In my view, by providing for the vacancy caused by removal and compulso-

suspension who remains in office would remain subject to all the constraints of the Code of Judicial Conduct and the Constitution. His activities would necessarily be greatly limited. A suspended jurist who has forfeited his office, however, would be removed from the supervisory authority of this Court and be free to engage in any legitimate undertaking available to him. Ironically, this could include immediately running for election to the same office vacated by his forfeiture.

3. By way of example, it is noted that the Fifth Judicial District (Allegheny County) is presently operating with four seats vacant, with no certainty as to the time in which they will be filled. This amounts to double the loss of judicial manpower that would be suffered in Philadelphia were the two respondents the majority requires to forfeit their offices merely suspended.

ry retirement and not making similar provision for the filling of a vacancy caused by other forfeiture of office, the Constitution recognizes that there are no other means by which the judicial office may be forfeited.

It is difficult to trace the precise origin of the penalty of "suspension" in Article V, § 18. Review of the documents circulated prior to and at the Constitutional Convention of 1967–68 reveals essentially two formulations of the proposals as to punishment for misconduct—"any justice or judge may be removed from office or otherwise disciplined for misconduct" and "any judge may also [in addition to impeachment] be removed from office, suspended without pay, or otherwise disciplined for misconduct in office." In all preliminary drafts and proposals where suspension is referred to, it is in the form of "suspended without pay." My reading of the documents of the Convention convinces me that the use of the term "suspension" in the final proposal submitted to and approved by the people, was not intended to allow for the expansion of the meaning of the term beyond its ordinary sense of a temporary impediment, but was no more than a stylistic revision, the penalty being set out in Section 17, and the further qualification that it be "without pay" being transferred to Section 16, which deals with compensation.

It strikes me as ironic that the majority is motivated to fashion a hybrid punishment intermediate between "suspension" and "removal" because of the heavy caseloads of the courts. Large caseloads and backlogs are not new; the floor discussions of the 1967–68 Constitutional Convention are replete with descriptions of a heavy backlog of cases, particularly in Philadelphia. The delegates had an intimate familiarity with the problem of overburdened courts. I, therefore, cannot accept the view that the scheme of punishment they crafted, allowing for replacement of the offending jurist in some instances and not in others, must be specially "interpreted" to accommodate this circumstance. Were it not for the magnitude of the corruption whereby so many of the judges of this one judicial district face simulta-

neous punishment for misconduct, it would not even be questioned but that the system could adapt to function efficiently through a period of the temporary absence of one or more judges, by the reassignment of active judges and assignment of senior judges. (Indeed, that these absences are accompanied by cessation of salary, leaves the budgeted funds available to compensate retired judges called into service.)

Applying the above analysis to the individual cases before us would not change the result in any situation except those of Respondents Porter (No. 120) and Dempsey (No. 123). In those cases, the majority would suspend Respondents and declare their offices forfeited and therefore vacant. As noted, such a disposition creates a new and unwarranted level of discipline. The majority's review of the record demonstrates sufficient evidence of misconduct to warrant removal of these Respondents as well. On that basis, I would order removal of each of the judges now before the bar of this Court.

PAPADAKOS, Justice, concurring.

I join with the Majority in concluding that the Respondent Judges must forfeit their offices. However, I write separately to caution the Board that its role in a quasi-judicial setting is not to condemn the system of selecting our judiciary. This is a political question best left to the political arena.

To suggest that the elective process is flawed and partially to blame for the events leading up to today's conclusion, or that the political climate tended to blight the moral sensitivities of these Respondents, is to insult the integrity of every honest judge who has ever been the product of this selective process and who was not touched by the so-called "flaws" or "political climate."

The Respondents reach the end of their respective judicial careers today because they forgot, or never learned, that in the human experience money has never been used in exchanging gifts with public officials occupying positions of

public trust. From the time of Justinian The Great, the receipt of monetary gifts by Judges has been cause for immediate forfeiture of office. The manner of selecting a judge must never be interposed as an excuse for selling one's public office.