570 A.2d 57

**In the Matter of The Honorable John CHIOVERO, Court of Common Pleas of Philadelphia County.**

Supreme Court of Pennsylvania.

Argued Oct. 26, 1988.

Decided Jan. 24, 1990.

Joseph J. Carlin, Philadelphia, for respondent.

Robert L. Keuch, Executive Director, Washington, D.C., for J.I.R.B.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.*

The Judicial Inquiry and Review Board (Board) has made a determination recommending to us that the Honorable John J. Chiovero (Respondent) Judge of the Court of Common Pleas of the First Judicial District (Philadelphia County), suffer the extreme sanction of removal and forfeit automatically his judicial office and thereafter be ineligible for judicial office. (See Art. V, Sec. 18, Pa. Const.).

Having reached such a determination, the Board has filed a certified copy of its recommendation, transcript, findings, and conclusions with our Prothonotary and, following the submission of briefs and oral arguments, the matter is ripe for our independent review and evaluation of the record of the Board's proceedings on the law and facts and to reach a conclusion that is just and proper on the record presented to us. (Rule 16, JIRB Rules of Proc.)

The Judicial Inquiry and Review Board is established by Article V, Section 18, of the Pennsylvania Constitution and is charged with the duty of investigating and hearing allegations of misconduct by members of the judiciary, which allegations it may find, after preliminary investigation, to require formal proceedings and a hearing and to recommend sanctions to this Court for "the dereliction that it has found to have occurred". Article V, Section 18(g). See

---

* This matter was reassigned to this writer.

also, Rule 1. Preliminary Investigation, Rules of Procedure Governing the Judicial Inquiry and Review Board.

On August 14, 1987, the Executive Director and General Counsel (General Counsel) of the Board notified the Respondent that the Board, of its own volition, had commenced an inquiry into allegations that roofing work had been done on Respondent's home at 3726 Conshohocken Avenue in the City of Philadelphia, and that he had not paid the full value for this work. The notice advised that "This conduct would appear to involve possible violations of Canons 1, 2, and 5(C)(1) of the Code of Judicial Conduct." The Respondent was given the opportunity to provide an answer or other information relevant to this allegation.

The Respondent answered, through counsel, that he felt that this matter had been put to rest in other proceedings before the Board which had terminated without including this charge. Also, the Respondent felt that he was prohibited from responding to the questions asked because a matter involving this allegation and the proper reporting of it on an appropriate financial disclosure statement was pending before the Supreme Court of Pennsylvania.

Without acknowledgment of this response and without further correspondence, the Board, on December 7, 1987, commenced formal proceedings against the Respondent and sent him Notice of Institution of Formal Proceedings together with Charges For Formal Proceedings. The charges were framed as follows:

"... Judge John J. Chiovero, has violated the Constitution of the Commonwealth of Pennsylvania, Article V, Section 17(b) which provides as follows:

"Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court."

Specifically, the Board charges that Respondent has violated Canons 1, 2, and 5(C)(1) of the Code of Judicial Conduct, adopted November 21, 1973, effective January 1, 1974, of the Supreme Court of Pennsylvania in that:

On or about October of 1985, Respondent accepted roofing work performed on his residence at 3726 Conshohocken Avenue, Philadelphia, Pennsylvania, and Respondent either did not pay or did not pay full value for the work that was done.

The Charges for Formal Proceedings concludes that if it is established that the Respondent accepted a free roof, then he is guilty of the following derelictions in his judicial conduct:

He failed to observe high standards of conduct so that the integrity of the judiciary may be preserved;

He failed to conduct himself in a manner to promote the public confidence in the integrity and impartiality of the judiciary;

He knowingly permitted others to convey the impression that they are in a special position to influence him;

He engaged in financial dealings which tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position and involve him in transactions likely to come before the Court on which he serves.

Pursuant to Board Rule 5, a hearing was convened before three members of the Board on February 25, 1988, where the Board received testimony and exhibits relating to the charges filed against the Respondent. Following the close of the record, proposed findings were submitted by the Respondent and General Counsel and, on July 26, 1988, the Board issued its opinion in which it found that Respondent did, in fact, accept free roofing work from potential litigants and that he offered no explanation for this. The Board concluded that these facts were violative of Canons 1, 2 and 5(C)(1) of our Code of Judicial Conduct and recommended to this Court that Respondent be removed from his judicial office.

Once this recommendation was lodged with this Court, we began our mandatory review of this matter by ordering the parties to file briefs and appear before us for oral argument. Respondent basically argues that the evidence

presented by General Counsel of the Board at the hearing held in this matter is insufficient to establish the violation of any canons of Judicial Conduct.

 Before we begin our review of the findings of fact and conclusions reached by the Board, we restate certain principals which we have announced in the past as guidance in reviewing disciplinary matters brought to us by the Board. We are vested with the responsibility of making an independent review of the record created by the Board to determine for ourselves whether the charges have been established by clear and convincing evidence. *In re: JIRB v. Snyder*, 514 Pa. 142, 523 A.2d 294 (1987), *cert. denied sub nom., Snyder v. Pennsylvania Judicial Inquiry & Review Board*, 484 U.S. 829, 108 S.Ct. 100, 98 L.Ed.2d 61 (1987). The inferences to be drawn from testimony presented is also a matter for us to make based on our review of the evidence. *Matter of Cunningham*, 517 Pa. 417, 538 A.2d 473 (1988). Clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. *In re: Matter of Sylvester*, 521 Pa. 300, 555 A.2d 1202 (1989).

This paradigm of legal evidence requires that there exist jurisdiction, the violation of a promulgated canon, probable cause that the canon was violated, competent, relevant and material evidence supporting a *prima facie* case that the respondent violated the canon, to be proven by clear and convincing legal evidence. This paradigm embraces all of the constitutional presumptions of innocence, all of the constitutional rights, powers, privileges and immunities of an accused known to our civil and criminal jurisprudence.

To require less is to give the JIRB wider ranging powers than is consistent with their purpose or fundamental constitutional protections. The JIRB is required by the Pennsylvania Constitution, for the protection of the judiciary and the respondent, to keep their proceedings secret until they recommend a sanction to this Court. The other end of that

secrecy is the power to go beyond their purpose. Unaccountable secrecy, with its attendant opportunity to harass, intimidate, favor, raise or lower standards in particular unreported cases, to satisfy their view of what ought to be or not be, is a power beyond any known to our law. A tribunal that operates in secrecy can indulge its suspicions, yield to public pressure, even its whims, send zealous agents with a deliberate intent to find grounds to bring a judge beneath its influence for good or purposes of their own. Their purposes can run the gamut used by secret power to bend compliance to their wishes. Whether they do or not, the existence of the possibility must render them strictly accountable whenever their proceedings surface.

As far as the interpretation of the Code of Judicial Conduct and its application, we recognize that the Code is written in broad language. Prohibitive canons or rules, or laws of any kind, written with a broad brush as are our Rules of Judicial Conduct, give very little notice to those affected regarding the kinds of specific conduct prohibited. *Matter of Dalessandro*, 483 Pa. 431, 397 A.2d 743 (1979). The broadness of the Canons is considered in determining the degree of notice afforded a judge consistent with due process. *Dalessandro*. We have also made clear that the whole of the Code of Judicial Conduct does not have the force of substantive law, rather, it imposes standards of conduct upon the judiciary to be referred to by a judge in his self-assessment of whether to act in a particular manner. *Reilly by Reilly v. SEPTA*, 507 Pa. 204, 489 A.2d 1291 (1985); *Goodheart v. Casey*, 523 Pa. 188, 565 A.2d 757 (1989), *Catania v. Commonwealth, State Employees' Retirement Board*, 523 Pa. 188, 565 A.2d 757 (1989).

The interpretation of those canons is within our sole jurisdiction and the application and enforcement of those canons is a part of our exclusive role as administrative and supervisory head of the unified judicial system in our Commonwealth. Where we determine that the canons have been violated, we unhesitatingly impose discipline to insure public faith in the integrity of our judiciary and in fulfill-

ment of our constitutional role. *Cunningham; JIRB v. Snyder,* 514 Pa. 142, 523 A.2d 294 (1987); *JIRB v. Fink,* 516 Pa. 208, 532 A.2d 358 (1987).

■ The JIRB, in conformance to legal evidence, can only proceed upon probable cause for an identifiable, defined offense. That is they do not have independent authority to determine what is appropriate, they can only determine what conduct is or is not appropriate according to a promulgated rule. Not their rules, but rules defined as the Constitution provides, by the judicial Canons and rules of procedure enacted by this Court. Nor are they entitled to interpret them according to what they believe they ought to provide.

Proceedings held before the Board have been held to be quasi-criminal in nature, *Matter of Dandridge,* 462 Pa. 67, 337 A.2d 885 (1975), and we have never held that a respondent-jurist before the Board is not clothed with the fundamental constitutional rights available to criminal defendants.

■ It is true that the Board's recommendation has no binding effect on this Court, given our mandate of de novo review; it is merely advisory at best, and comes here with no special presumption in its favor. *Matter of Glancey,* 518 Pa. 276, 542 A.2d 1350 (1987). This does not mean, however, that procedural irregularities and constitutional violations will be countenanced or overlooked, simply because our final determination may "cure" all procedural and substantive defects.

As already noted, the JIRB is mandated to secrecy until their recommendations surface for our *de novo* review. That mandated secrecy is an unfortunate, if not abhorrent anomaly in modern law. Whatever its advantage to a respondent, it is unaccountable unless a sanction is imposed. Its downside is more fraught with possible abuse than any advantage to a respondent and, in fact, it can become a fundamental danger to the existence of an independent judiciary. That is to say that the possibility to harass,

intimidate, raise or lower standards as the occasion may appeal to the private judgment of the JIRB or its members in unreported cases is enormous. *In the Matter of XYP*, 523 Pa. 411, 567 A.2d 1036 (1989). The more so, because their jurisdiction is as wide as it is vague. Such phrases as "high standards" "tend to" "conduct himself in a manner" can create areas for private judgment, however salutary or designedly virtuous their intention. Meanwhile, secrecy hides the ineluctable powers of the JIRB to inquire, to influence, indeed to terrorize, harass and intimidate those who would rather accept a milder sanction, albeit unauthorized, than face the costs and troubles of resistance.

The secrecy is, however, mandated and we must observe it. Given these obvious and inherent dangers, we must therefore utilize the highest constitutional scrutiny in our *de novo* review, insisting that all of the legal requirements, including the rules we provide for the JIRB, be meticulously observed.

It is the obligation of this Court, and this Court alone (except for impeachment proceedings), to determine if a judicial officer has, in fact, breached the trust reposed in him and the appropriate sanction for such a violation.

Respondent was charged with violating Canons 1, 2 and 5(C)(1) of the Code of Judicial Conduct.

Canon 1 of the Code provides:

A Judge Should Uphold the Integrity and Independence of the Judiciary.

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

Canon 2 of the Code provides in pertinent part:

A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities.

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or knowingly permit others to convey the impression that they are in a special position to influence him.

Finally, Canon 5(c)(1) provides:

A Judge Should Regulate His Extra-Judicial Activities to Minimize the Risk of Conflict With his Judicial Duties.

C. Financial Activities

(1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court in which he serves.

In support of establishing violations of these Canons, General Counsel sought to introduce the testimony of several witnesses, including the Respondent. The Respondent had been issued a subpoena to compel his attendance at the hearing. When the Respondent was called to testify and he attempted to invoke his privilege against self-incrimination, the Board Chairman made it very clear that, in his view, not only were the protections of the Fifth Amendment unavailable, but any refusal to testify could be held against the Respondent (N.T., p. 20–21). In its opinion, the Board noted as *significant* the Respondent's refusal to testify and cited JIRB Rule of Procedure 5(b) which we cite as the Board did:

"(t)he failure of the judge to answer ... at the hearing shall not, *standing alone,* be taken as evidence of the truth of the facts alleged to constitute grounds for suspension, removal, discipline or compulsory retirement." (emphasis added).

The Board then went on to conclude that "where evidence of wrongdoing is presented and the accused judge refuses to deny misconduct, failure to respond may be considered by the Board when making its factual determinations."

■ We are deeply troubled by the Board's failure to acknowledge the right of a respondent judge to invoke his fundamental constitutional right to refrain from incriminating himself in an admitted quasi-criminal proceeding. We are also disturbed in the manner in which the Board has misapplied Rule 5(b).

First, we must make it crystal clear that in such disciplinary proceedings, we have never held that the Board is permitted to call the respondent-jurist as a witness and, consistent with constitutional restraints, use of compulsory process is not permitted to compel either the attendance or the testimony of a respondent-judge. Rule 6 cannot be read to authorize such compulsory attendance.[1]

In fact, had the Board cited Rule 5(b) in its entirety, it would have been obvious that a judge cannot even be

---

1. Rule of Procedure No. 6 Governing the Judicial Inquiry and Review Board provides as follows:

 Rule 6. Evidence

 (a) At the hearing, legal evidence only shall be received, and oral evidence shall be taken on oath or affirmation.

 (b) The Board shall have the power to compel the attendance and testimony of witnesses and the production of documents. The Board shall issue subpoenas on its own motion, or on request of the complainant or the judge involved. The subpoena shall be served in the same manner as other subpoenas. The Board may enforce the subpoena by initiating contempt proceedings in the Common Pleas Court of the County wherein the party resides or may be found. The Board may require a physical or mental examination of the judge involved and may appoint one or more physicians to make the examination and report to them. The judge shall be entitled to receive a copy of the report of such examination.

 (c) With the approval of the Board, testimony before an investigating or hearing committee may be taken by deposition or by commission if the witness is not subject to service of subpoena or is unable to attend or testify because of age, illness or other infirmity. A complete record of the testimony so taken shall be made and preserved.

 (d) Rules of confidentiality as set forth in Rule 1(c) shall be observed.

 Amended, June 30, 1975, effective July 1, 1975.

compelled to appear at an investigatory hearing. The full sentence provides, "The failure of the judge to answer or to appear at the hearing shall not, standing alone, be taken as evidence of the truth of the facts alleged to constitute grounds for suspension, removal, discipline or compulsory retirement."

Whatever ambivalence others may give to silence in the face of accusation, we are charged to give it its strictest meaning, and however plain may be suspicion rising from refusal to answer, that refusal is not evidence from which inference can be drawn. That is an unavoidable rule of legal evidence and where applicable, the JIRB has no choice but to enforce it or lose their credibility, if not their jurisdiction, over a case so poisoned.

Rule 5 protects a jurist against any adverse inference being drawn from his failure to answer the Charge Letter of the Board or his failure to appear for any reason at a Board hearing. This rule merely cautions the Board that it cannot attach significance to the failure of a jurist to appear or testify. The Board must find derelictions of duties based solely on the evidence it receives against the jurist from its General Counsel, or counsel specially appointed pursuant to Rule 5, who bear the sole burden of establishing each violation, element for element.

That being the case, it was totally improper for the Board to call the Respondent as a witness, to require him to testify against himself, and to attach any significance to his failure to testify.

The right of a jurist to defend himself against the charges by testifying or by presenting other evidence in his defense is protected by Rule 7(a) and we find the Board's attempt to call the Respondent as one of its witnesses a violation of the constitutional and procedural rights of the respondent. A Hobson's choice cannot be forced upon a respondent-judge, either testify against yourself or your silence may be considered an admission of your guilt!!! Fundamental fairness demands that the General Counsel, or

Special Counsel, acting on behalf of the Board, as movant, must prove its case against the accused and that it does not meet its burden by relying on the jurist's failure to respond in any way.

It is unfortunate that the Board Chairman sought to influence the view of the other members of the Hearing Committee by voluntarily inserting into the proceedings and the record his personal views that the Respondent must testify or his failure to do so can be used against him. We caution the members of the Board to avoid the appearance of pre-judgment, bias or partiality by voicing their personal interpretations of the Code of Judicial Conduct as promulgated by this Court or the laws of this Commonwealth which apply with equal force and vigor to protect all of our citizens regardless of station or rank.

In this instance, however, the Respondent did appear on the stand. The issue then becomes whether his failure to respond to any question posed to him during direct examination may be considered by the Board in determining the validity of the factual allegations underlying the charges against him. It should be readily apparent that if a respondent jurist may not be subpoenaed to testify, his refusal to testify may not be considered by the Board when making its factual determination.

Having reiterated the legal issues implicated in this matter, we now turn to the facts as we find them in the record presented to us and make our conclusions based thereon.

Sometime in 1985, Respondent spoke to Stephen Traitz, Business Agent for Roofers Union Local 30 and 30B, regarding a recommendation for a roofing contractor. As a result of this request, Traitz set into motion a series of events which culminated in a new roof being installed on the Respondent's home. The record shows that the Respondent did not know that a new roof had been installed on his home until after it had been done. The record shows that the Respondent had not requested the installation of a new roof, had not been contacted in any manner by the roofing

contractor, had not been given an estimate of the cost of a new roof, had not been given the opportunity to reject the offer of a new roof, and had not been presented with a bill for the new roof. The testimony of Special Agent Grace of the Federal Bureau of Investigation revealed that he asked the Respondent whether he had any roofing work done on his home and whether Mr. Stephen Traitz had anything to do with this work. Agent Grace indicated that the Respondent answered that he may have spoken to Mr. Traitz regarding the recommendation of a roofing contractor but we are not told when this conversation with Mr. Traitz took place (N.T., p. 84).

The testimony of Mr. Joseph J. Smith, President and owner of Joseph S. Smith Roofing, Inc., was to the effect that one of his stewards, Mr. Jack Marlowe, a member of the Roofers Union Local 30–30B, of which Mr. Traitz was business manager, contacted Mr. Smith and asked him to send a crew to the Respondent's house to check the roof. Mr. Smith sent the crew to the house with instructions to do whatever was necessary to repair the roof. A crew was dispatched to the house and upon an inspection of the roof, the crew foreman determined that a new roof was required. The crew, without conferring with the Respondent, removed the old roof and installed a new roof. Upon their completion, the crew returned to their workplace and were paid by Smith Roofing, Inc., for their work. No bill was ever sent to the Respondent because Mr. Marlowe asked Mr. Smith to do him a favor, as he had done for others in the past (N.T., p. 55–56).

From this evidence we can find as a fact that Respondent needed roofing work on his home and that he asked Mr. Traitz to recommend a roofing contractor. Instead of making such a recommendation, Traitz presumably arranged for the crew which appeared at Respondent's home, and without the Respondent's knowledge or consent, installed a new roof and did whatever was necessary to fix the roof. Respondent was neither billed for the roofing work nor has he paid Smith Roofing, Inc. for the work.

From the sparcity of evidence in the record, we can only surmise that Traitz, business manager of the Roofer's Union, arranged for Mr. Marlowe to see to it that the Respondent's roof be looked at and taken care of. In short, Traitz arranged to give the Respondent a new roof on his personal residence, whether he needed a new roof or not, whether he could afford a new roof or not. The new roof was delivered in such a manner that the Respondent could not have prevented its installation nor could he return it after it was installed. Was he thereafter required, by law, to pay for something he had not ordered and could not return? Of course, the question of payment is moot since no bill has ever been rendered.

Recently, we have in the *Cunningham* case, had occasion to discuss under what circumstances jurists may accept gifts. We therein indicated that gifts are not improper per se. What is improper is a gift given to influence a jurist in the performance of his or her judicial responsibilities. In plain English, this is called a "bribe."

"Whatever the value of the token, if it is *given* and *received* to secure a favored position for the donor with the jurist in the performance of his or her official responsibilities, the impartiality of the judgment has been eroded and the integrity of the process destroyed thereby. *The question is not the intrinsic value of the thing offered but its impact upon the actions of the jurist.*" *Cunningham,* 517 Pa. at 417, 538 A.2d at 480. (Emphasis added).

Thus, where the Board produces clear and convincing evidence that a person makes a gift of anything of value with the expectation of being placed in a favored position, and that the jurist received the thing of value aware of the donor's improper motives, the Board may have satisfied its burden of proving a violation of Canons 1, 2 and 5(c)(1). At that point, the jurist may seek to "legitimize" the transaction by establishing that the gift was given only in connection with a special relationship and that the recipient was satisfied at the time of the transaction that the circumstances surrounding the acceptance of the gift would not

create a reasonable basis for the donor to believe that the transaction places the donor in a position to exert improper influence over the jurist in the discharge of his judicial duties. See, *Cunningham,* 517 Pa. at 441, 538 A.2d at 486.

In *Cunningham,* we specifically found that the evidence supported a finding that the cash gifts were given and received with the intent to curry favor with the donee jurists in an expectation of favored treatment in the event any of the members of the Union appeared before that jurist. Such evidence is critical to establishing that an improper gift was accepted by a jurist and, as indicated, is part of the the Board's case against any jurist charged with violations of Canons 1, 2 and 5(c)(1).

We have carefully reviewed the record created by the Board in this matter and find no evidence to support a finding that Traitz was in a special position to influence Respondent, or that he arranged the roofing work here so that he could curry special favor for members of the Union who might appear before Respondent or that the Respondent was aware of any of these motives, or that he received or accepted the roofing work in this light, and, not surprisingly, the Board has made no such finding. There is simply no evidence from any source to establish this critical element and all we are left with is that the Respondent was given a free roof, when all he asked for was the name of a roofing contractor.

In its Conclusions of Law, the Board opines that the Respondent received a free roof from "potential litigants." There is no evidence in the record before us to suggest that any of the players in this roofing skit would ever be litigants before the Respondent or that they were "potential litigants." We cannot believe that the Board views every human being on earth as a "potential litigant" and that judges henceforth cannot interact with any human beings. In the abstract sense, of course, every resident and visitor of Philadelphia County and all those having business contacts with them might be categorized as "potential litigants" before any of the judges there; it would be absurd,

however, to require judges to view everyone they encountered as a "potential litigant" and circumscribe their interactions accordingly.

In short, we see no evidence in the record prepared by the JIRB and submitted to us to support a finding that Respondent received an *improper* gift in violation of the Canons, and the charges under Canons 1, 2 and 5(C)(1) must be dismissed.

If there were improper reasons for the Respondent's inquiry of Mr. Traitz and that individual's intent in undertaking to see to it that the Respondent's inquiry was satisfied, such evidence should have been made a part of this record and, if it was simply unavailable, then no charges should have been made.

We stress that this case presents a very different picture from that presented in *Cunningham* where the evidence established the corrupting motive for the gift and the willing participation of the donees, and we reject the Board's contrary conclusion. The record before us contains no evidence whatever to explain the motive for the furnishing of a new roof to one who did not order same and who has not been shown to be anything but an *unwitting* participant in whatever the scheme or motive of Traitz. More importantly, there is no evidence to support the conclusion that the Respondent was aware of any improper motives when he "accepted" the new roof.

Under such circumstances, there can be no showing of a failure to uphold the standards of integrity or an erosion of the public's confidence in the judiciary.

Because the charges brought against the Respondent were not proved by clear and convincing evidence, they are dismissed, with prejudice.

■■■ That, however, is not the end to this inquiry. It is clear that one who holds a position of public trust must answer for the stewardship of his office. That is, he must answer for the performance of his duty to those authorized to inquire, (see *Garrity v. New Jersey*, 385 U.S. 493, 87

S.Ct. 616, 17 L.Ed.2d 562 (1967)), without fear that his answers can be used in any other forum for prosecutorial purposes beyond dismissal from office by this Court. It was respondent's duty to respond to questions required on the Statement of Financial Interest. He argued before this Court that he was protected against that question on 5th Amendment grounds.

In *Matter of Glancey*, 515 Pa. 201, 527 A.2d 997 (1987), which concerned the Respondent and Judge Joseph R. Glancey, we determined, after an extensive review of the relevant United States Supreme Court cases [2], that a jurist could be removed from office for failing or refusing to answer the disclosure statement, because it was "specifically, directly and narrowly" related to the performance of his duties. *Glancey*, at 217, 527 A.2d at 1005. Accordingly, we directed Respondent "to provide the required information" with respect to question 11 of the disclosure statement, which related to possible gifts.

In response to our order, Respondent completed question 11 as follows:

11 a) *Cash*—None

b) *Property*—Roofing work was performed at 3726 Conshohocken Avenue, Philadelphia upon my request through Stephen Traitz, Sr. It is not certain whether the price paid by me represented the full reasonable value for those services.

In making this answer, as required, the Respondent may have been phrasing his answer to constitute both an answer to the question and a response to charges then being considered by the JIRB. When he was ordered to respond by this Court he might have said he received "no gift", and the Board would have been put to its burden of proving that in fact he did and that the gift was an improper one.

**2.** *Uniformed Sanitation Men Association v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

Given the answer that he paid but was uncertain of the fair market value (whether a judge must always pay fair market value is a quiddity yet unresolved) he cannot refuse us a more specific answer to question 11 on any grounds. The record filed with us reflects that after initially reviewing Respondent's answer the Board filed a motion with this Court seeking to impose the original threat of removal for failing to answer question 11 fully.

However, instead of waiting for this Court's determination of whether a more specific answer was required, the JIRB proceeded with its inquiry, perhaps thinking that a full explanation would be forthcoming in the anticipated testimony of respondent at the hearing. However, at this hearing, Respondent exercised his Fifth Amendment rights, thereby effectively weaving a Gordian Knot around the JIRB's attempt to pry this information out of the respondent. The JIRB then took the impermissible step of ascribing overriding significance to Respondent's failure to testify, otherwise, based on the insufficient facts established by this record, the JIRB could not have found "clear and convincing evidence" of anything.

As Alexander the Great demonstrated, the way to loosen the Gordian Knot is to cut through it. Accordingly, we direct Respondent to file with this Court a full, accurate and specific answer to question 11 by describing completely the "facts" surrounding the installation of his roof. The answer is to be submitted under oath within thirty (30) days of the entry of this opinion. If Respondent fails to answer or provides an incomplete answer, he shall be subject to immediate removal from office, for misconduct, without further notice, in accordance with Pennsylvania Supreme Court Order 47 (1984) and *Matter of Glancey*.

LARSEN, J., did not participate in the consideration or decision of this matter.

STOUT, Former Justice, did not participate in the decision of this matter.

NIX, C.J., files a dissenting opinion in which FLAHERTY, J., joins.

NIX, Chief Justice, dissenting.

In this case the majority has made a mockery of the "integrity of our judiciary" which it purports to uphold. In the latest chapter of the sad saga of the Philadelphia Roofer's scandal, the majority opinion, by intimation, excoriates the constitutionally mandated Judicial Inquiry and Review Board ("JIRB"). The opinion makes no real attempt to apply controlling, unanimously held case law while simultaneously justifying the acceptance of a gift of substantial value by posturing the recipient as merely an *"unwitting participant"* (original emphasis), at 65. It artfully discreates this Court's requirement that all members of the judiciary disclose their financial status and activities each year. If such spuriousness is accepted in exoneration of the conduct here involved, public confidence in the integrity of our judicial system can appropriately be expected to sink to unimagined depths.

## I.

As previously noted by this writer, under the scheme of Article V, Section 18 of the Constitution of this Commonwealth, "a recommendation of removal by the Judicial Inquiry and Review Board ... requires this Court's action before it has efficacy." *In the Matter of the Judicial Inquiry and Review Board v. Snyder,* 514 Pa. 142, 151, 523 A.2d 294, 300 (1987) (Nix, C.J., Concurring Opinion joined by Flaherty, J.). Article V, § 18(g) provides: "If, after hearing, *the Board finds good cause* therefor, it *shall recommend to* the Supreme Court...." Article V, § 18(h) states: "The Supreme Court shall review the record of the Board's proceedings on the law and facts and may permit the introduction of additional evidence. It *shall order* ... [the form of discipline] ..., as it finds just and proper." To *suggest* that this broad scope of review was vested in this Court by the people of this Commonwealth because of an apprehension that the members of the Board would abuse the rule of confidentiality that surrounds their deliberations, would give vent to personal animosities, would re-

spond to base personal predilictions or prejudices, or would deliberately and knowingly render an unfair judgment demeans the intelligence of the people and distorts the motives of the electorate of this state, for such a suggestion has no foundation in fact.

The constitutional rule for confidentiality,[1] was designed *for the protection of* the reputation of the jurist whose conduct may become the subject of an inquiry based upon meritless or unfounded accusations. It is a recognition that the honest and fair judge is vulnerable to unjustified and scurrilous attacks upon his character by those who may be offended by his proper exercise of the office. *See, Boettger v. Loverro,* 521 Pa. 366, 377, 555 A.2d 1234 (1989). To suggest that the rule of confidentiality might invite a Board of this stature to "indulge its suspicions, yield to public pressure, even its whims, send zealous agents with a deliberate intent to find grounds to bring a judge beneath its influence for good or purposes of their own", at p. 60, reflects a siege mentality totally unrelated to reality and casts grave aspersions upon the integrity of highly respected citizens of this Commonwealth who have been called upon to volunteer to perform an important societal function. While we may disagree in a particular instance with the judgment of this body, it is unseemly to invite general suspicion of the body as an institution.

The majority apparently has overlooked the fact that under Article V, § 18(a) this Court is charged with the responsibility of naming five of the nine members of that Board. The remaining four members of the Board are named by the Governor. To indirectly question the integrity of the Board members without foundation would be to impune the judgment of the appointing authorities.

## II.

The fiction that the gift to Judge Chiovero was not improper was reached by examining the record *as if* Judge

---

1. The majority's use of the term "secrecy" in place of the Constitution's term "confidential[ity]" is obviously designated to raise the sinister specter of the Star Chamber.

Chiovero had not responded to the financial disclosure form; *as if* there were a new standard prohibiting the use of a jurist's response to the financial disclosure form as substantive evidence and by ignoring the relevant case law.

It is not disputed that the roof on Judge Chiovero's home was in need of repair, and in response to that need, he called Stephen Traitz, who was then the business agent for Roofers Union Local 30–30B. The record reflects that, during an interview with a member of the FBI, Judge Chiovero stated his reason for calling Mr. Traitz on that occasion was to receive a recommendation as to roofing contractors. In prompt response to this conversation, a roofing company installed an entirely new roof on the Judge's residence. The testimony of record also reflects that the company never received payment for the labor and material involved in the installation of that roof. Both the owner of the contracting company and the crew foreman testified that no bill was ever issued to Judge Chiovero, nor was payment ever received. That testimony was not disputed by Judge Chiovero. Therefore, that testimony can be believed without question.

We agree with the majority's conclusion that the evidence presented establishes the fact that a gift was received, at 64; however, the basis for the majority's conclusion is substantially different from the basis employed by this writer. The majority asks the public to accept the conclusion that Judge Chiovero's inquiry was not intended to elicit the response of a gift by Stephen Traitz. That conclusion would not be difficult to accept if Judge Chiovero had paid for the work involved after it was apparent that he was not being billed; such action by Judge Chiovero would have prevented any appearance of impropriety. However, that was not the case. As stated previously, the majority gratuitously characterizes Judge Chiovero as an "unwitting participant" in this gift, at 65, and suggests that a judge should not be legally bound to pay for something which he did not explicitly authorize and which he can not return. At 64.

Here is the case of a judge who definitely accepted a gift of substantial value. Although Judge Chiovero did not directly contact the contractors who performed the work, his inquiry to Stephen Traitz concerning roofing work set in motion the wheels of favors and influence. In fact, Judge Chiovero himself implicitly characterized the roof as a gift by including it in response to question 11 of the financial disclosure form required by this Court's Order No. 47 of April 13, 1984.[2] Therefore, it is clear that Judge Chiovero accepted a roof without payment and believed it to be a gift.

The majority's decision turns upon the propriety of such a gift being accepted by a judicial officer. As we noted in *Matter of Cunningham,* 517 Pa. 417, 538 A.2d 473 (1988), the fact that an individual serves as a judge does not preclude that individual from acceptance of gifts under proper circumstances.

This Court's rejection of a *per se* prohibition against a jurist receiving a gift reflected our recognition that there would be occasions where such acceptance would be proper. The interest to be protected is the impartiality of the judicial process; the impropriety of accepting gifts arises only when that interest is compromised. Thus a *per se* prohibition is not only unnecessary, it would constitute an unnecessary restriction upon the conscientious jurist.

*Id.,* 517 Pa. at 433, 538 A.2d 481.

The test as to the propriety of the acceptance of a gift was carefully delineated in that decision:

Thus when a jurist is offered a gift by litigant he or she must be aware of the possible appearance of an impropriety. Such gifts should not be accepted unless a relationship exists, and the circumstances are such that a

**2.** In an amended statement of financial interest Judge Chiovero responded that partial payment was tendered; he clearly stated that he was not certain if the undisclosed amount paid was in fact the full value for those services. Further, Judge Chiovero does not make clear how he arrived at the amount he supposedly paid since no bill was issued and no direct contact between the judge and the contractors ever existed.

conclusion of wrongdoing cannot reasonably be drawn. The jurist must be held accountable, even though he or she may not harbor an intent to show favor to the donor, in those circumstances which would legitimately give rise to a contrary conclusion. *See In the Matter of Dandridge*, 462 Pa. 67, 337 A.2d 885 (1975). In accepting gifts in questionable situations the judge exposes himself to such a charge. Such a demanding standard is justified in view of the importance of the interest to be protected. *Id.*, 517 Pa. at 430, 538 A.2d 479. (Emphasis added.)

Moreover, the majority stated that once the Board has established the acceptance of a gift, that transaction could be made legitimate,

but *only if the donee [jurist] is able to establish* (1) that the gift was given only in connection with that relationship and (2) that the donee is satisfied that the circumstances surrounding the acceptance of the gift would not create a reasonable basis for the donor to believe that the gift places the donor in a position to exert improper influence over the donee in the discharge of his legal duties.

*Id.*, 517 Pa. at 441, 538 A.2d at 486. (Emphasis added.)

Mr. Justice Papadakos is satisfied that the record before us presents no evidence that Mr. Traitz was in a special position to influence Judge Chiovero, p. 65,[3] or that he arranged the roofing work here so that he could curry special favor for members of the Union who might be before Judge Chiovero. However, even a cursory review of the record reveals sufficient evidence to create an appearance of impropriety for a judge who accepted a roof worth over $2,000 as a gift from a union business manager, with whom he had no previous relationship which could explain such a gift. A judge must expect to be held to a higher level of scrutiny and be willing to limit his conduct, if necessary, in order to maintain the public's confidence in his

**3.** The majority ignores the fact that *Matter of Cunningham,* 517 Pa. 417, 538 A.2d 473 (1988), established Mr. Traitz enjoyed a special position to influence judges.

or her impartiality. As this Court noted in *In Re Greenberg*, 442 Pa. 411, 280 A.2d 370 (1971):

> [A] judge must possess the confidence of the community; ... he must not only be independent and honest, but, equally important, believed by all men to be independent and honest.... Without the appearance as well as the fact of justice, respect for the law vanishes in a democracy.

*Id.*, 442 Pa. at 416, 280 A.2d at 372.

It is important to note that Judge Chiovero did not attempt to "legitimize" the gift accepted in this case, as was his burden. The majority's attempts to shift the burden of the donee, set forth in *Cunningham*, by stating, "More importantly, there is no evidence to support the conclusion that the respondent [Judge Chiovero] was aware of any improper motives when he accepted the new roof." At 65. However, the Court in *Cunningham* clearly placed the burden on the jurist to legitimize any gift brought into question by the Board. Therefore, without any testimony of Judge Chiovero to explain the reason for a gift from a union businessman, with whom he had no prior relationship, the conclusion of impropriety drawn by the Board must be accepted.

Respondents to a disciplinary matter are not guaranteed the rights of a criminal defendant. This Court in *Matter of Glancey*, (Glancey I), 515 Pa. 201, 527 A.2d 997 (1987), addressed the precise issue of the applicability of the Fifth Amendment to a judicial officer in a Board proceeding. We held that where a question posed by the Board "specifically, directly and narrowly" relates to the performance of the respondent-jurist's official duties, "the Fifth Amendment is not a bar to the removal of a judicial officer for refusing to provide the information sought." *Glancey I, supra*, 515 Pa. at 217, 527 A.2d at 1002. This proposition was reiterated in *Matter of Glancey*, (Glancey II), 518 Pa. 276, 542 A.2d 1350 (1988), wherein we held:

> We do not believe that requiring a judge to respond honestly to an official inquiry would be unduly burden-

some on the judicial official, nor do we believe that it creates a Hobson's choice which effectively abridges that official's rights under the Fifth Amendment to the United States Constitution.

518 Pa. at 288, 542 A.2d at 1356.

Incredulously, the majority disregarded these two opinions, *Glancey I and II.* Significantly, each member of the present majority joined in both of these opinions; it is therefore difficult to understand how such collective action could have occurred. Candor, at the very least, should have required the majority to explain its *sub silentio* departure from such recent precedent. Notwithstanding, *Glancey I* and *Glancey II* are irreconcilable with today's result.

Further, the matter in which the majority characterizes Judge Chiovero's role in accepting the new roof gift as "unwitting" is a far cry from how this Court perceived former Judge Thomas A. White's explanation that money left on his desk by an agent of the Roofer's Union was left without his knowledge. In former Judge White's case, *In The Matter of Honorable Thomas A. White, sub nom, Matter of Cunningham, supra,* this entire Court characterized former Judge White's explanation of his mental state as "specious." *Cunningham,* 517 Pa. at 443, 538 A.2d at 481. I fail to see the difference between the two mental states, nor do I comprehend how this Court can rationally distinguish, as to truthfulness, between the two statements.

### III.

The majority clearly eviscerates or discreates this Court's requirement that all members of the judiciary disclose their financial status and activities each year. This is ingeniously accomplished by affording Judge Chiovero another opportunity to answer question 11 of the Statement of Financial Disclosure more fully, and with impunity, because the charges brought against Judge Chiovero are dismissed with *prejudice.* At pp. 198–199. It serves no purpose to direct the judge to give a "full, accurate and specific answer to question 11 by describing completely the facts surrounding

the installation of his roof." Having exonerated Judge Chiovero in this opinion, the Court now pays only lip service to our requirement that the Statement of Financial Disclosure must be completed.

Besides, there is no reason why Judge Chiovero should be afforded a third chance to answer a question he was required to answer but failed twice before. As the majority clearly stated, "In *Matter of Glancey*, [*Glancey I, supra*] ..., we determined, after an extensive review of the relevant United States Supreme Court cases [footnote omitted], that a jurist could be removed from office for failing or refusing to answer the disclosure statement ... [citation omitted]." However, in this case, the majority is content to allow the same jurist involved in *Glancey*, a third chance to answer or fail to answer question 11.

Finally, I am extremely troubled by the disparate treatment afforded Judge Chiovero as compared with former Judges Kenneth Harris, Julian King and Thomas White, *Cunningham, supra,* insofar as the evidential value of the financial disclosure forms are concerned. In those cases, the jurist's response to the financial disclosure form was used as substantive evidence. Here, Judge Chiovero's amended and inadequate response is treated as if that response did not exist; the response was not used at all by the majority in its analysis of the case. Have we not violated fundamental notions of fairness? As former Chief Justice (then Justice) Roberts stated in his eloquent dissent in *Commonwealth v. Miller*, 490 Pa. 457, 475, 417 A.2d 128, 137 (1980), "[i]t should no longer be open to question that decisions of this Court, particularly those of constitutional import, must be applied to all cases then pending direct review. *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801)...."

I repeat, this record, even without consideration of the statement in the financial disclosure form, supports the Board's recommendation of removal.

I strenuously dissent.

FLAHERTY, J., joins in this dissent.